1  XAVIER BECERRA
   Attorney General of California
2  PAUL STEIN
   Supervising Deputy Attorney General
3  JAY C. RUSSELL, State Bar No. 122626
   CHAD A. STEGEMAN, State Bar No. 225745
4  PETER H. CHANG, STATE BAR NO. 241467
   Deputy Attorneys General
5    455 Golden Gate Ave., Ste. 11000
     San Francisco, CA  94102-7004
6    Telephone:  (415) 510-3776
     Fax:  (415) 703-1234
7    E-mail:  Peter.Chang@doj.ca.gov
   *Attorneys for State Defendants*

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10                  SACRAMENTO DIVISION

11

12

13  JERRY GRIFFIN, et. al,
                                    No. 2:19-cv-01477-MCE-DB
14                       Plaintiffs,  No. 2:19-cv-01501-MCE-DB
                                    No. 2:19-cv-01506-MCE-DB
15       v.                         No. 2:19-cv-01507-MCE-DB
                                    No. 2:19-cv-01659-MCE-DB
16
    ALEX PADILLA,                   **STATE DEFENDANTS' OMNIBUS**
17                       Defendant.  **OPPOSITION TO MOTIONS FOR**
                                    **PRELIMINARY INJUNCTION**
18

19  AND RELATED CASES.              Hearing Date: Sept. 19, 2019
                                    Hearing Time: 2:00 p.m.
20                                  Location: Courtroom 7
                                    Judge: Hon. Morrison C. England, Jr.
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................ 1

Background ......................................................................................................... 3

    I.     The Presidential Tax Transparency and Accountability Act ................................ 3

    II.    The Plaintiffs and Claims Relevant to Their Motions ........................................ 5

Argument ........................................................................................................... 6

    I.     Plaintiffs Are Not Likely to Succeed on the Merits. .......................................... 7

        A.    The Act Does Not Create an Additional Qualification In Violation of the Presidential Qualifications Clause. ................................................. 7

        B.    The Act Does Not Exceed California's Authority to Regulate Elections. ................................................................................. 10

        C.    The Act Does Not Violate Plaintiffs' First Amendment Associational, Ballot-Access, or Voting Rights. ................................... 12

            1.    The Burdick balancing test. ....................................... 13

            2.    The Act imposes only a slight burden on plaintiffs' asserted rights. ........................................................ 14

            3.    The act furthers the State's compelling interests, which outweigh the slight burden on plaintiffs' asserted rights. ............. 19

        D.    The Act Does Not Violate Plaintiff De La Fuente's First Amendment Right Against Compelled Speech. ................................... 22

        E.    The Act Does Not Violate the Equal Protection Clause. ........................ 24

            1.    The Act does not unconstitutionally discriminate against partisan candidates in favor of independent candidates. .............. 24

            2.    The Act does not otherwise violate the Equal Protection Clause. ................................................................. 26

        F.    The Act Is Not Preempted by EIGA. ...................................... 26

        G.    The Act Does Not Violate, and Is Not Preempted by, the Internal Revenue Code. ....................................................... 28

    II.    In the Absence of any Constitutional Violation, Plaintiffs Cannot Show Irreparable Harm ........................................................ 30

    III.   Plaintiffs Cannot Meet Their Burden to Show that the Balance of Equities and the Public Interest Tip in Their Favor ......................................... 30

Conclusion.......................................................................................... 31

i

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Abbott v. Perez*
 138 S.Ct. 2305 (2018) ............................................................................ 30

5

6

*Altria Grp., Inc. v. Good*
 555 U.S. 70 (2008) ................................................................................ 26

7

*Am. Beverage Ass'n v. City & Cty. of San Francisco*
 916 F.3d 749 (9th Cir. 2019) .................................................................... 6

8

9

*Anderson v. Celebrezze*
 460 U.S. 780 (1983) ........................................................................ *passim*

10

*Ariz. Libertarian Party v. Reagan*
 798 F.3d 723 (9th Cir. 2015) ............................................................. 14, 16

11

12

*Ariz. v. Inter Tribal Council of Ariz., Inc.*
 570 U.S. 1 (2013) ................................................................................. 11

13

*Asis Internet Servs. v. Consumerbargaingiveaways, LLC*
 622 F. Supp. 2d 935 (N.D. Cal. 2009) ...................................................... 27

14

15

*Barry v. City of New York*
 712 F.2d 1554 (2d Cir. 1983) ............................................................ 17, 20

16

*Bates v. Dow Agrosciences LLC*
 544 U.S. 431 (2005) .............................................................................. 26

17

18

*Biener v. Calio*
 361 F.3d 206 (3d Cir. 2004) ............................................................... 8, 10

19

20

*Buckley v. Valeo*
 424 U.S. 1 (1976) (*per curiam*) .............................................................. 20

21

*Bullock v. Carter*
 405 U.S. 134 (1972) .......................................................................... 14, 15

22

23

*Burdick v. Takushi*
 504 U.S. 428 (1992) .......................................................................... 13, 14

24

25

*Campbell v. Davidson*
 233 F.3d 1229 (10th Cir. 2000) ................................................................. 8

26

*Cartwright v. Barnes*
 304 F.3d 1138 (11th Cir. 2002) ................................................................. 9

27

28

ii

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Chamness v. Bowen*
 722 F.3d 1110 (9th Cir. 2013) .............................................. 14

4

5

*Clements v. Fashing*
 457 U.S. 957 (1982) ........................................................ 14

6

*Communist Party of Indiana v. Whitcomb*
 414 U.S. 441 (1974) ...................................................10, 15

7

8

*Cook v. Gralike*
 531 U.S. 510 (2001) ....................................................12, 19

9

10

*De la Fuente v. Merrill*
 214 F. Supp. 3d 1241 (M.D. Ala. Oct. 7, 2016) ....................... 9

11

*De La Fuente v. Padilla*
 930 F.3d 1101 (9th Cir. 2019) ...................................14, 16, 21

12

13

*Democratic Party of U.S. v. Wis.*
 450 U.S. 107 (1981) ........................................................ 25

14

15

*Dudum v. Arntz*
 640 F.3d 1098 (9th Cir. 2011) .............................................. 14

16

*Duplantier v. United States*
 606 F.2d 654 (5th Cir. 1979) .............................................. 17

17

18

*El-Amin v. State Bd. of Elec.*
 717 F. Supp. 1138 (E.D. Va. 1989) ....................................... 18

19

*Fed. Election Comm'n v. Furgatch*
 807 F.2d 857 (9th Cir. 1987) .............................................. 20

20

21

*Fritz v. Gorton*
 517 P.2d 911 (Wash. 1974) ................................................ 15

22

23

*Garcia v. Google, Inc.*
 786 F.3d 733 (9th Cir. 2015) ................................................ 7

24

25

*Hein v. Freedom From Religion Found., Inc.*
 551 U.S. 587 (2007) ......................................................... 5

26

*Human Life of Wash. Inc. v. Brumsickle*
 624 F.3d 990 (9th Cir. 2010) ...........................................20-21

27

28

iii

# TABLE OF AUTHORITIES
### (continued)

Page

*Illinois State Employees Ass'n v. Walker*
315 N.E.2d 9 (Ill. 1974) ........................................................................ 15

*Indep. Living Ctr., So. Cal. v. Maxwell-Jolly*
572 F.3d 644 (9th 2009)......................................................................... 30

*Int'l Franchise Ass'n, Inc. v. City of Seattle*
97 F. Supp. 2d 1256 (W.D. Wash. 2015) .............................................. 27

*Interpipe Contracting, Inc. v. Becerra*
898 F.3d 879 (9th Cir. 2018) ................................................................ 24

*Libertarian Party of Illinois v. Rednour*
108 F.3d 768 (7th Cir. 1997) .................................................................. 9

*Lomont v. Summers*
135 F. Supp. 2d 23 (D.D.C. 2001) ........................................................ 29

*Lubin v. Panish*
414 U.S. 709 (1974)............................................................................... 15

*Matsumoto v. Pua*
775 F.2d 1393 (9th Cir. 1985) .............................................................. 19

*McClellan v. I-Flow Corp.*
776 F.3d 1035 (9th Cir. 2015) .............................................................. 29

*Merle v. United States*
351 F.3d 92 (3d Cir. 2003) ...................................................................... 9

*Montgomery Co. v. Walsh*
336 A.2d 97 (Md. 1975)......................................................................... 15

*Munro v. Socialist Workers Party*
479 U.S. 189 (1986)............................................................................... 13

*Murphy v. Nat'l Collegiate Athletic Ass'n*
138 S. Ct. 1461 (2018) .......................................................................... 28

*O'Brien v. DiGrazia*
544 F.2d 543 (1st Cir. 1976) ................................................................. 17

*Orin v. Barclay*
272 F.3d 1207 (9th Cir. 2001) .............................................................. 26

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Plante v. Gonzalez*
575 F.2d 1119 (5th Cir. 1978) .................................................................15, 17, 20

*Printz v. United States*
521 U.S. 898 (1997)................................................................................ 28

*Public Integrity Alliance, Inc. v. City of Tucson*
836 F.3d 1019 (9th Cir. 2016) (en banc)................................................12, 13, 22

*Riley v. National Federation of the Blind of North Carolina, Inc.*
487 U.S. 781 (1988)................................................................................ 23

*Rucho v. Common Cause*
139 S. Ct. 2484 (2019) ........................................................................... 11

*Rumsfeld v. Forum for Academic & Institutional Rights (FAIR), Inc.*
547 U.S. 47 (2006).................................................................................. 22

*Schaefer v. Townsend*
215 F.3d 1031 (9th Cir. 2000) ............................................................8, 9, 10

*Schaumburg v. Citizens for a Better Environment*
444 U.S. 620 (1980)................................................................................ 23

*Stein v. Howlett*
289 N.E.2d 409 (Ill. 1972) ...................................................................... 15

*Storer v. Brown*
415 U.S. 724 (1974)................................................................................ 25

*U.S. Term Limits, Inc. v. Thornton*
514 U.S. 779 (1995)............................................................................ 8, 11

*United States v. Sheriff, City of N.Y.*
330 F.2d 100 (2d Cir. 1964) .................................................................... 29

*Univ. of Texas v. Camenisch*
451 U.S. 390 (1981).................................................................................. 6

*Van Susteren v. Jones*
331 F.3d 1024 (9th Cir. 2003) ............................................................... 8, 25

*West Virginia Board of Education v. Barnette*
319 U.S. 624 (1943)................................................................................ 24

**TABLE OF AUTHORITIES**
(continued)

Page

*Williamson v. Lee Optical of Ok. Inc.*
348 U.S. 483 (1955)..................................................................... 21

*Winter v. Nat'l Res. Def. Council, Inc.*
555 U.S. 7 (2008)................................................................... 6, 30

*Wooley v. Maynard*
430 U.S. 705 (1977).................................................................. 24

*Wyeth v. Levine*
555 U.S. 555 (2009).................................................................. 26

**STATUTES**

5 U.S.C. Appendix
4 .......................................................................................... 4
4 § 101(a)(3) ..................................................................... 18
4 § 101(c)..................................................................18, 21, 27
4 § 102(b) ........................................................................ 18
4 § 107(b) ....................................................................26, 27

26 U.S.C. § 6103 ................................................................ *passim*

California Elections Code
§ 6000.1....................................................................15, 16
§ 6000.2.......................................................................... 16
§ 6002 ............................................................................ 22
§ 6881....................................................................4, 13, 30
§ 6883....................................................................10, 16
§ 6884....................................................................4, 16, 29
§ 8900............................................................................ 4

California's Presidential Tax Transparency and Accountability Act.................................... *passim*

Ethics in Government Act of 1978 ....................................... *passim*

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution Article 2, § 1, cl. 5 ......................................... 8

**OTHER AUTHORITIES**

California Secretary of State, Qualified Political Parties,
https://www.sos.ca.gov/elections/political-parties/qualified-political-parties/
(last visited Sept. 5, 2019)..................................................... 4

## TABLE OF AUTHORITIES
### (continued)

Page

*President Nixon's Troublesome Tax Returns*, The Tax History Project (May. 1, 1974), https://bit.ly/1XazOkc (last visited Sept. 5, 2019)........................................................ 3

**INTRODUCTION**

California's Presidential Tax Transparency and Accountability Act ("the Act") is a constitutionally valid ballot-access measure that requires presidential and gubernatorial candidates to redact and submit their last five tax returns to the Secretary of State for public release if they wish to appear on the primary election ballot.  The California Legislature passed the Act to codify a custom followed by presidential candidates for the past five decades.  The Legislature found that candidates' income tax returns contain essential information regarding their financial interests and business dealings, and illuminate potential conflicts of interest and other improprieties.  It determined the Act will help California primary voters make better informed decisions when choosing presidential and gubernatorial candidates in primary elections, and promote the California's compelling interest in ensuring an informed electorate.  Without the Act, California primary voters would not have access to information about the financial interests of presidential candidate running in California's primaries, since financial disclosures under the federal Ethics in Government Act (EIGA) are not available until after California's primary.

Five sets of plaintiffs challenge the Act, including two presidential candidates, three political organizations, and eight individual voters.  They seek a preliminary injunction based on claims, made either collectively or separately, that the Act violates the United States Constitution's Presidential Qualifications Clause, by imposing an additional "qualification" on the Office of the President, and that it violates the First Amendment, by infringing on the candidates' ballot-access rights and rights against compelled speech, the political organizations' associational rights, and the voters' associational and voting rights.  They further claim the Act violates the Equal Protection Clause and is preempted by EIGA and 26 U.S.C. § 6103(a), which prohibits government officials from disclosing an individual's tax returns without consent.

The motions should be denied because plaintiffs' claims are not likely to succeed on the merits, and the balance of harms tips heavily in favor of the State Defendants.  The Act does not create an absolute bar on ballot access or impose a handicap on a constitutionally significant class of candidates based on any additional "qualification" inherent in the candidate—*all* candidates

1

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

are capable of complying with the Act.  Moreover, the Act is a generally applicable, even-handed ballot-access measure, and any slight burden imposed on the plaintiffs' asserted First Amendment rights is outweighed by the State's compelling interest in ensuring an informed electorate. Significantly, neither presidential-candidate plaintiff has identified any practical burden imposed on them by the Act.  They simply do not want to comply.  And the non-candidate plaintiffs' purported harm is derived from the candidate's choice not to comply, not from the Act itself.  The Act also does not compel speech by forcing candidates to associate with messages or opinions with which they disagree; candidates only need disclose truthful, factual information already provided by the candidates themselves to taxing authorities.

The equal-protection challenge to the Act is also insubstantial.  Contrary to plaintiffs' theory, partisan and independent candidates are not "similarly situated" with respect to the routes they must take to get to the general election ballot.  The Act applies only at the primary stage, where independent candidates do not compete.  There is no unlawful discrimination.

And finally, the Act is not preempted by either EIGA or the Internal Revenue Code, 26 U.S.C. § 6103(a).  Plaintiffs fail to show that Congress intended EIGA to preempt states from requiring candidates to make tax disclosures in state-run primary elections.  The supposed express "preemption clause" they cite makes no specific reference to tax returns, state law, or preemption. And EIGA's legislative history confirms that Congress did not intend to preempt state law.  The Act also is not preempted by, and does not violate, the Internal Revenue Code, 26 U.S.C. § 6103(a), because nothing in federal law prevents candidates from providing consent to state officials to release their tax returns to the public.

Because plaintiffs fail to show any constitutional violation or preemption, they also fail to show that the Act causes them irreparable harm.  And the non-candidate plaintiffs' harm is fully derived from presidential candidates' choices, not from the Act.  The only harm here would result from an injunction barring enforcement of a duly enacted state law, and the harm would be inflicted on California voters, who would be deprived of critical information about the candidates appearing on the primary ballot.

Finally, the Court should not enjoin enforcement of the Act because it would be against

2

1   the public interest to permit presidential primary candidates to withhold vital information from

2   voters about the candidates' financial interests and business dealings.  In light of the critically

3   important public interest in disclosure, and plaintiffs' failure, including candidate-plaintiffs De La

4   Fuente and President Trump, to allege any concrete, practical injury stemming from compliance

5   with the Act, the balance of equities tips sharply in favor of the State Defendants.

6          Accordingly, plaintiffs' motions should be denied.

7                                        **BACKGROUND**

8   **I.     THE PRESIDENTIAL TAX TRANSPARENCY AND ACCOUNTABILITY ACT**

9          In 1973, newspapers published information showing that President Richard Nixon had

10  paid an inexplicably low amount of federal tax in 1969, given his income for that year.  When

11  called upon to release his tax returns, President Nixon responded: "I welcome this kind of

12  examination because people have got to know whether or not their president is a crook.  Well, I

13  am not a crook."[1]  Nixon eventually released his tax returns and underwent an Internal Revenue

14  Service audit.  The IRS ultimately determined that President Nixon had improperly deducted

15  more than $500,000 for papers donated to the National Archives, and he paid nearly half of his

16  net worth in back taxes.[2]

17         In the forty-six years since then, most presidential candidates have voluntarily released

18  their federal tax returns as a matter of routine.  Voters—including voters in California primary

19  elections—have had the benefit of this information when evaluating presidential candidates.  But

20  during his 2016 presidential campaign, Donald Trump broke with this longstanding tradition and

21  refused to release his tax returns.  Sen. Floor Analysis to Senate Bill No. 27 (2019-2020 Reg.

22  Sess.) July 10, 2019, at 5.  Prompted by this break in customary practice, the California

23  Legislature enacted Senate Bill 27, the Presidential Tax Transparency and Accountability Act.

24  *Id.*

25         In enacting the bill, the Legislature found that California "has a strong interest in ensuring

26  that its voters make informed, educated choices in the voting booth," and that "a Presidential

27  _____

28  [1] Alan Axelrod, *Profiles on Folly* 104 (Sterling Publishing 2008).
    [2] William D. Samson, *President Nixon's Troublesome Tax Returns*, The Tax History Project (May. 1, 1974), https://bit.ly/1XazOkc (last visited Sept. 5, 2019).

3

1    candidate's income tax returns provide voters with essential information regarding the candidate's

2    potential conflicts of interest, business dealings, financial status, and charitable contributions."

3    Cal. Elec. Code § 6881.  California "has a special interest in the President refraining from corrupt

4    or self-enriching behaviors while in office," and the people of California "can better estimate the

5    risks of any given Presidential candidate engaging in corruption or the appearance of corruption if

6    they have access to the candidates' tax returns." *Id.*  "The information in tax returns therefore

7    helps voters to make a more informed decision." *Id.*  While the information in a candidate's tax

8    return is partially covered in the candidate's Federal Election Commission filing mandated by

9    EIGA, 5 U.S.C. App. 4, "the information contained in a tax return is broader and more specific."

10   Sen. Floor Analysis to Senate Bill No. 27 (2019-2020 Reg. Sess.) Apr. 24, 2019, at 4.

11          Accordingly, consistent with the goal that California voters be an "informed electorate,"

12   the Act requires presidential primary candidates to file with the Secretary of State two copies of

13   their income tax returns from the five most recent taxable years, one of which has the candidate's

14   personal information redacted, as well as consent for the Secretary of State to publicly release the

15   redacted copy on the Secretary's website. *See* Cal. Elec. Code § 6884(a).[3]  After the official

16   canvass for the presidential primary election is completed, the public versions of the tax returns

17   must be removed from the website. *Id.* § 6884(b)(3).  After the official canvass of the ensuing

18   general election, the Secretary of State must destroy the paper copies of the submitted returns. *Id.*

19   § 6884(b)(4).

20          While not challenged in this case, the Act also applies to all candidates for California

21   governor participating in primary elections. *See* Cal. Elec. Code § 8900.

22          There are six political parties that are qualified to participate in California's upcoming

23   primary elections: the American Independent Party, the Democratic Party, the Green Party, the

24   Libertarian Party, the Peace and Freedom Party, and the Republican Party. *See* California

25   Secretary of State, Qualified Political Parties, https://www.sos.ca.gov/elections/political-

26   _____

27          [3] The Act requires candidates to redact social security numbers, home addresses, telephone numbers, email addresses, medical information (Cal. Elec. Code § 6884(a)(1)(B)), and permits candidates to redact the names of dependent minors, employer identification numbers, business addresses, and paid tax return preparers' tax identification numbers, addresses, telephone numbers, and email addresses. *Id.* § 6884(a)(1)(C).

28   

4

1   parties/qualified-political-parties/ (last visited Sept. 5, 2019).

2   **II.   THE PLAINTIFFS AND CLAIMS RELEVANT TO THEIR MOTIONS**

3          The five related cases were brought by two presidential candidates (Roque "Rocky" De La

4   Fuente and current President Donald J. Trump), a reelection-campaign principal committee

5   (Donald J. Trump for President, Inc.), national and state political parties (the Republican National

6   Committee and the California Republican Party), and eight registered voters (Griffin, Bolotin,

7   Sienkiewicz, Oerding, Koenig, Melendez, Essayli, and McDougald).

8          Plaintiffs Griffin, Bolotin, Sienkiewicz, and Oerding (collectively, the *Griffin* Plaintiffs) are

9   individual voters who assert as bases for their motion that the Act violates (1) the Qualifications

10   Clause (*Griffin* Mem. in Supp. Mot. Preliminary Inj. (*Griffin* Mot.), No. 2:19-cv-01477 ECF No.

11   20-1 at 3-6), (2) their First Amendment rights to associate with the presidential candidate of their

12   choice (*id.* at 7), and (3) the Equal Protection Clause (*id.* at 11-12).[4]

13          Plaintiffs Donald J. Trump for President, Inc. and Donald J. Trump, in his personal capacity

14   (collectively, the *Trump* Plaintiffs), are the incumbent President, Donald J. Trump, and his re-

15   election campaign committee.  They assert as bases for their motion that the Act (1) violates the

16   Qualifications Clause (*Trump* Mem. in Supp. Mot. for Preliminary Inj. (*Trump* Mot.), No. 2:19-

17   cv-01501 ECF No. 10-1 at 6), (2) violates President Trump's First Amendment right to access the

18   Republican primary election ballot (*id.* at 11), (3) exceeds the states' authority to regulate

19   elections (*id.* at 8), and (4) is preempted by EIGA (*id.* at 13).

20          Plaintiffs Melendez, Essayli, McDougald, the Republican National Committee, and the

21   California Republican Party (collective, the *Melendez* Plaintiffs) assert as bases for their motion

22   that the Act violates (1) the Qualifications Clause (*Melendez* Mem. in Supp. of Mot. Preliminary

23   Inj. (*Melendez* Mot.), No. 2:19-cv-01506 ECF No. 17, at 8-10), (2) their voter plaintiffs' First

24          [4] Plaintiffs Bolotin and Oerding lack standing to challenge the Act because they do not
25   claim to support any presidential candidates who would be listed on the primary election ballot
     except for the Act.  *See* Declaration of Michelle Bolotin, 2:19-cv-01477 ECF No. 20-4;
     Declaration of James B. Oerding, 2:19-cv-01477 ECF No. 20-6.  To establish Article III standing,
26   "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful
     conduct and likely to be redressed by the requested relief."  *Hein v. Freedom From Religion*
27   *Found., Inc.*, 551 U.S. 587, 597-98 (2007).  Plaintiffs Bolotin and Oerding fail to allege any
     personal injury caused by the Act.

28

1   Amendment right to associate with to and vote for presidential candidates (*id.* at 10-14), (3) their

2   political organization plaintiffs' right to associate and to select a presidential candidate (*id.* at 14-

3   15), and (4) the Equal Protection Clause (*id.* at 16-17).[5]

4       Plaintiff Koenig is a California voter who is a registered Republican.  He asserts as bases

5   for his motion that the Act violates (1) the Qualifications Clause (*Koenig* Mem. in Supp. Mot.

6   Preliminary Inj. (*Koenig* Mot.), No. 2:19-cv-01507 ECF No. 11-1, at 8), and (2) his right to vote

7   for the primary candidate of his choice and his right to associate with other members of the

8   Republican Party to select their presidential nominee (*id.* at 14-17).

9       Plaintiff De La Fuente is a voter and a declared candidate for the 2020 presidential

10   nomination of the National Republican Party.  (*De La Fuente* Compl., No. 2:19-cv-01659 ECF

11   No. 1, at ¶ 5.)  He asserts as bases for his motion that the Act violates (1) the Qualifications

12   Clause (*De La Fuente* Mem. in Supp. Mot. for Emergency Preliminary Inj. (*De La Fuente* Mot.),

13   ECF No. 6-1 at 12), (2) 26 U.S.C. § 6103(a), which protects the confidentiality of tax returns (*id.*

14   at 21), and (3) his First Amendment right against compelled speech (*id.* at 23).

15                                   **ARGUMENT**

16       Plaintiffs' motions should be denied because the plaintiffs are not likely to succeed on the

17   merits of their claims.  A preliminary injunction is "an extraordinary remedy that may only be

18   awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat'l Res.*

19   *Def. Council, Inc.,* 555 U.S. 7, 22 (2008); *Am. Beverage Ass'n v. City & Cty. of San Francisco*,

20   916 F.3d 749, 754 (9th Cir. 2019).  It is never awarded "as of right," but in each case, "courts

21   must balance the competing claims of injury and must consider the effect on each party of the

22   granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (citation omitted).  "The

23   purpose of a preliminary injunction is merely to preserve the relative positions of the parties until

24   a trial on the merits can be held."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)

25       [5] The *Melendez* Plaintiffs never served their preliminary injunction on the State
26   Defendants as their preliminary injunction motion was filed before they served the State
     Defendants with the Summons and the Complaint, and plaintiffs did not include a copy of the
     motion with the documents served.  (*See* Summons Returned Executed, ECF No.
27   26.)  Defendants object to the *Melendez* Motion on that basis.  However, Defendants do address
     the arguments made in the *Melendez* Motion in this omnibus opposition in the event the Court
28   considers the motion on the merits.

1   (emphasis added).

2       To prevail on their motions for a preliminary injunction, plaintiffs must establish:  (1) a

3   likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of

4   preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is

5   in the public interest.  *Winter*, 555 U.S. at 20.  "Because it is a threshold inquiry, when a plaintiff

6   has failed to show the likelihood of success on the merits, [the Court] need not consider the

7   remaining three *Winter* elements."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

8   I.    **PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.**

9       None of the claims asserted by plaintiffs in their preliminary injunction motions are likely

10  to succeed as a matter of law.  Therefore, a preliminary injunction should not issue.

11      **A.    The Act Does Not Create an Additional Qualification In Violation of the
            Presidential Qualifications Clause.[6]**

12

13      The Act is a type of generally applicable, even-handed ballot-access measure that courts

14  have routinely upheld.  Contrary to plaintiffs' assertions, it does not impose an additional

15  substantive "qualification" that renders a constitutionally significant class of potential candidates

16  ineligible for the Office of the President.  Indeed, the Act's requirements are less stringent than

17  other ballot-access measures upheld by courts against Qualifications Clause challenges, such as

18  those requiring candidates to resign from their jobs in order to run, common disaffiliation and

19  "sore loser" laws that preclude candidates from running for a period of time after an unsuccessful

20  primary bid, and measures requiring candidates to obtain voter signatures or pay fees to appear on

21  the ballot.

22      To determine whether a ballot-access measure is an unconstitutional "qualification,"

23  courts conduct a two-part inquiry: whether the state law "create[s] an absolute bar to candidates

24  who would otherwise qualify under the Qualifications Clause"; and if it does not, whether the

25  state law has the "likely effect of handicapping an otherwise qualified class of candidates."

26      [6] All plaintiffs assert that the Act violates the Presidential Qualifications Clause of the
    United States Constitution.  (*Griffin* Mot. at 3; *Melendez* Mot. at 8; *Koenig* Mot. at 8; *Trump* Mot.
27  at 6; *De La Fuente* Mot. at 12.)

28

                                            7

1    *Schaefer v. Townsend*, 215 F.3d 1031, 1035 (9th Cir. 2000) (citing *U.S. Term Limits, Inc. v.*

2    *Thornton*, 514 U.S. 779, 828 (1995)).[7]  Under this two-part inquiry, courts have found

3    unconstitutional qualifications for members of Congress in, for example, district residency

4    requirements, loyalty oath requirements, voter registration requirements, and restrictions on those

5    convicted of felonies.  *Id.* (citing *U.S. Term Limits, Inc.*, 514 U.S. at 799; *Schaefer*, 215 F.3d at

6    1039; *Campbell v. Davidson*, 233 F.3d 1229, 1231 (10th Cir. 2000)).  The Act is fundamentally

7    different from the restrictions at issue in any of those cases, and does not violate the Presidential

8    Qualifications Clause.  U.S. Const. art. 2, § 1, cl. 5.

9        First, the Act's financial-disclosure requirement is not an "absolute bar" to presidential

10    candidates who would otherwise meet the terms of the Qualifications Clause.  In this context, an

11    "absolute bar" means a qualification that is "inherent in the candidate."  *Biener v. Calio*, 361 F.3d

12    206, 212 (3d Cir. 2004).  In contrast, where a candidate is *able* to meet the ballot-access

13    requirement, but chooses not to, the candidate is not subject to an "absolute bar."  As the Third

14    Circuit held in upholding a state law requiring candidates to pay a filing fee against a

15    Qualifications Clause challenge, "a candidate financially able to pay a filing fee, but unwilling to

16    do so, is not being subjected to an impermissible wealth requirement."  *Biener*, 361 F.3d at 212;

17    *see also Van Susteren v. Jones*, 331 F.3d 1024, 1027 (9th Cir. 2003) (upholding under the

18    Qualifications Clause state law requiring partisan candidates to be disaffiliated from membership

19    in other political parties for one year before filing for primary ballot access).  Even the Ninth

20    Circuit in *Schaeffer* did not question the district court's finding that the residency requirement at

21    issue there did not erect an "absolute bar" to a candidate's participation, because the candidate

22    could comply by moving to California.  *Schaeffer*, 215 F.3d at 1036.  Similarly here, a

23    candidate's ability to disclose tax returns is not "inherent in the candidate;" therefore, the Act

24    does not pose an "absolute bar" to any candidate's ability to run in the presidential primary.

25        Second, the Act does not have the "likely effect of handicapping an otherwise qualified

26    class of candidates."  *Schaefer*, 215 F.3d at 1035.  In evaluating this inquiry, courts examine

27

28

---

[7] Although *Schaefer* specifically addressed the Representatives Qualifications Clause, the State Defendants assume that, for purposes of this opposition only, the analysis of that clause in cited cases also applies to the Presidential Qualifications Clause.

whether the purported class of candidates is a "class of Constitutional concern," as well as the

effect on the handicapped class, taking into account the purpose of the law.  *Id.*  For example, in

*Schaefer*, the Ninth Circuit held that a state law that required candidates for the House of

Representatives to reside in the state at the time nomination papers were filed was an

impermissible qualification, because the Representative Qualifications Clause requires only that a

candidate be a state resident "when elected."  *Id.* (citing U.S. Const. art. I, § 2).  The court held

that nonresident candidates were a class of constitutional concern and that the state's residency

requirement was an unconstitutional handicap on their candidacy.  *Id.* at 1037.  The court found

that the Framers had considered and explicitly rejected any requirement of in-state residency

before the election, and therefore the challenged residency requirement "imposed the very

requirement that the Framers purposefully excluded."  *Id.* at 1036-37.  The court further held that

the requirement significantly hampered nonresident candidates "with homes, families, and jobs in

another state," creating a possible deterrent for candidates from running for Congress.  *Id.* at

1037; *see also Merle v. United States*, 351 F.3d 92, 97 (3d Cir. 2003) (holding that a "'resign to

run' law may force the prospective candidate to make a choice between federal employment and

running for elective office, but does not constitute an 'additional qualification for the office of the

United States Representative.'"); *Cartwright v. Barnes*, 304 F.3d 1138, 1144 (11th Cir. 2002)

(holding that law requiring new political party to submit five-percent signature petition to

nominate a congressional candidate in the general election is a procedural requirement that does

not violate the Qualifications Clause); *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768 (7th

Cir. 1997) (same); *De la Fuente v. Merrill*, 214 F. Supp. 3d 1241 (M.D. Ala. Oct. 7, 2016)

(denying preliminary injunction motion because state "sore loser" law barring independent

candidate from appearing on the general election ballot if the candidate was a losing candidate in

a prior primary election was not based on a "substantive characteristic" and did not violate the

Presidential Qualifications Clause).

> Plaintiffs here have failed to show that candidates who refuse to disclose their tax returns

comprise a "class of Constitutional concern."  There is no suggestion by plaintiffs and no

authority for the proposition that candidates who refuse to disclose their tax returns make up a

1  class that the Framers sought to protect.  The Act also does not impose a "handicap" on any class

2  of candidates.  Unlike the state law in *Schaefer,* which required candidates for the House of

3  Representatives to uproot themselves and their families in order to qualify to run, the Act only

4  requires presidential primary candidates to provide the Secretary of State documents that all of

5  them already possess.[8]

6       Plaintiff De La Fuente tries to analogize the Act to loyalty oath requirements.  (*De La*

7  *Fuente* Mot. at 16.)  He reasons that all candidates are free to sign the oath, yet loyalty oaths have

8  been held unconstitutional; therefore, a requirement that candidates release their tax returns must

9  also be unconstitutional.  *Id.*  The critical flaw in De La Fuente's reasoning is that while a loyalty

10  oath may not be an "absolute bar" to candidacy, it would undoubtedly "handicap" a candidate

11  whose political beliefs could not be squared with the oath.  *See Communist Party of Indiana v.*

12  *Whitcomb*, 414 U.S. 441 (1974) (invalidating state law requiring party officers to file oath that the

13  party does not advocate the overthrow of the government by force as a condition of placing

14  candidates on the ballot).  Here, in contrast, the Act's financial disclosure requirement is more

15  akin to the filing fee upheld in *Biener*.  Compliance with the Act would create little or no burden

16  on the candidates.  Indeed, no plaintiff, including President Trump and De La Fuente, has

17  suggested any reason why it might be burdensome for presidential candidates to disclose their tax

18  returns.

19       For these reasons, the Act is a constitutional ballot-access measure, and not an

20  unconstitutional attempt to impose additional qualifications on the Office of the President.

21       **B.    The Act Does Not Exceed California's Authority to Regulate Elections.**

22       The *Trump* Plaintiffs separately argue that the Act "exceeds" California's authority to

23  regulate elections, relying on the same provisions governing the applicable qualifications for a

24  presidential candidate.  (*Trump* Mot. at 8-9.)  This argument is essentially the flip side of

25  plaintiffs' argument under the Qualifications Clause, and therefore fails for the reasons discussed.

26  _____

27       [8] The Act does not apply to any candidate for any year in which the candidate was not
required to file a tax return.  Cal. Elec. Code § 6883(c).  If a candidate had not yet filed a tax
return, the Act requires the candidate to submit a copy of the return within five days of filing with

28  the Internal Revenue Service.  *Id.* § 6883(b).

1    The *Trump* Plaintiffs' argument in this respect is based on the misunderstanding that states

2    have "limited authority" to prescribe regulations governing elections.  The Elections Clause

3    imposes on the states the duty "to prescribe the time, place, and manner of electing

4    Representatives and Senators," and "upon Congress it confers the power to alter those regulations

5    or supplant them altogether."  *Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013);

6    *Rucho v. Common Cause*, __ U.S. __, 139 S. Ct. 2484, 2495 (2019).  The scope of the Elections

7    Clause is broad, and the terms "Times, Places, and Manner" are comprehensive, "embrac[ing]

8    authority to provide a complete code for congressional elections."  *Inter Tribal Council of Ariz.,*

9    *Inc.*, 570 U.S. at 8; *see also Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) ("To achieve these

10   necessary objectives, States have enacted comprehensive and sometimes complex election

11   codes.").  The authority granted to the states includes the ability "to enact the numerous

12   requirements as to procedure and safeguards which experience shows are necessary in order to

13   enforce the fundamental right involved."  *U.S. Term Limits, Inc.*, 514 U.S. at 834 (citation

14   omitted).

15   The *Trump* Plaintiffs concede that states may impose "generally applicable and even-

16   handed" restrictions to protect the election process, but argue that the Act falls outside this scope.

17   (*Trump* Mot. at 8-9.)  Relying on *Anderson*, they contend a state has a less important interest in

18   regulating Presidential elections where the outcome will be largely determined by voters outside

19   the state.  (*Id*. at 9.)  That comparison is inapt because *Anderson* addressed a state law that

20   required independent candidates to file paperwork to appear on the presidential *general* election

21   ballot months earlier than partisan candidates.  In contrast, the Act regulates only California's

22   presidential *primary* election, the result of which is determined only by in-state voters.  Thus,

23   *Anderson* is plainly distinguishable.  *See Public Integrity Alliance, Inc. v. City of Tucson*, 836

24   F.3d 1019, 1027 (9th Cir. 2016) (en banc) (noting that "primaries serve a different function than

25   general elections" and are a "critical stage . . . as to which the legitimate state interests are not

26   identical with those pertinent to the general election").

27   The *Trump* Plaintiffs also erroneously argue that the Act "does not resemble any of the

28   'procedural' regulations" that have been upheld as valid exercises of state authority to regulate

11

1    elections.  (*Trump* Mot. at 9.)  As established above, however, the Act does not impose an

2    additional qualification or otherwise favor one presidential primary candidate over another—it

3    merely ensures that voters get additional information about the candidates, and leaves it for voters

4    to decide whether and what to do with this information.  And the *Trump* Plaintiffs' attempt to

5    equate the term-limits provision in *Cook v. Gralike*, 531 U.S. 510 (2001), with the Act's

6    requirements falls flat.  (*Trump* Mot. at 10.)  The challenged law in *Cook* was "plainly designed

7    to favor candidates who are willing to support the particular form of a term limits amendment,"

8    requiring members of the state's congressional delegation to promote the amendment and the

9    printing of a statement next to the candidate's name indicating whether he or she "disregarded

10   voters' instructions" or "declined to pledge" support for it.  *Cook*, 531 U.S. at 524.  The Act, by

11   comparison, does not require candidates to express any particular views.

12          As the Supreme Court has pointed out, "[t]here can be no question about the legitimacy of

13   the State's interest in fostering informed and educated expressions of the popular will in a general

14   election."  *Anderson*, 460 U.S. at 796.  The Act here properly fosters the same interest in

15   connection with the presidential primary.

16          **C.    The Act Does Not Violate Plaintiffs' First Amendment Associational,
               Ballot-Access, or Voting Rights.**
17

18          The Act is a reasonable, nondiscriminatory measure that imposes at most a slight burden on

19   plaintiffs' asserted First Amendment rights of association and ballot access, free speech, and

20   voting rights.  The minimal, if any, burden is outweighed by California's compelling interests.[9]

21   The Act requires candidates to disclose financial information similar to what must already be

22   reported to the Federal Election Commission before the presidential election (as opposed to the

23   primary election) under EIGA; and unlike the financial disclosures under EIGA, candidates do

24          [9] Plaintiff Trump argues that the Act burdens his rights to access the ballot and to
     associate with Republican voters.  (*Trump* Mot. at 11.)  Plaintiffs Koenig, Griffin, and Melendez
25   assert that the Act violates the voters' rights to vote for and associate with the presidential
     candidate of their choice.  (*Koenig* Mot. at 12; *Melendez* Mot. at 11; *Griffin* Mot. at 7.)  Plaintiffs
26   Republican National Committee and California Republican Party argue that the Act violates their
     right to select a presidential nominee.  (*Melendez* Mot. at 14.)  Plaintiff De La Fuente does not
27   raise a First Amendment ballot access or associational claim in his motion, though he raises the
     claim in his complaint.  (*See generally De La Fuente* Mot.)
28

                                              12

1  not have to prepare voluminous forms to comply with the Act.[10]  They need only submit tax

2  forms that were already submitted to the federal government.  The Act is also even-handed and

3  politically neutral: it applies to all primary party candidates and is intended to protect the integrity

4  of the election process and California's compelling interests in ensuring that its voters are able to

5  make informed, educated choices in the voting booth.  *See* Cal. Elec. Code § 6881.  Voters do not

6  otherwise have access to information about the financial interests of presidential candidates prior

7  to California's primary election.

8          1.      **The *Burdick* balancing test.**

9          In examining constitutional challenges to specific provisions of a state's election laws, the

10  Supreme Court has developed a flexible balancing standard: a court must weigh "the character

11  and magnitude" of the asserted injury against the "interests put forward by the State as

12  justifications for the burden imposed by its rule," taking into consideration the extent to which the

13  state interests make the burden necessary.  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal

14  quotation marks omitted) (citing *Anderson*, 460 U.S. at 789).  This Court has recently reaffirmed

15  the application of the *Burdick* test to challenges to voting regulations.  *Public Integrity Alliance,*

16  *Inc.*, 836 F.3d at 1024-25.

17          "[E]very law regulating elections, whether it governs the registration and qualifications of

18  voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—

19  at least to some degree—the individual's right to vote and his right to associate with others for

20  political ends." *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 729 (9th Cir. 2015) (emphasis

21  in original) (internal quotation marks omitted).  However, under the *Burdick* standard of review,

22  when a state election law imposes only "'reasonable, non-discriminatory restrictions . . . the

23  State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*,

24  504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).  Accordingly, the Supreme Court has

25  "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling

26  expressive activity at the polls." *Burdick*, 504 U.S. at 438 (citing *Munro v. Socialist Workers*

27          [10] The *Trump* Plaintiffs agree that EIGA already "requires presidential candidates to
disclose extensive personal financial information."  (*Trump* Compl. at ¶ 4, 2:19-cv-01501, ECF
28  No. 1.)

1  *Party*, 479 U.S. 189, 199 (1986)).   But when the asserted rights are subject to "severe

2  restrictions," the law must be "narrowly drawn to advance a state interest of compelling

3  importance." *Burdick*, 504 U.S. at 434.  The Ninth Circuit has "noted that 'voting regulations are

4  rarely subject to strict scrutiny.'"  *Chamness v. Bowen*, 722 F.3d 1110, 1116 (9th Cir. 2013)

5  (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011)).

6       A party challenging a state's elections law bears "the initial burden for showing that [the

7  state's] ballot access requirements seriously restricts the availability of political opportunity."

8  *Ariz. Libertarian Party*, 798 F.3d at 731 (citation omitted).

9       2.  **The Act imposes only a slight burden on plaintiffs' asserted rights.**

10      The Act is a reasonable, nondiscriminatory measure that imposes at most a slight burden on

11 plaintiffs' asserted First Amendment rights.  Plaintiffs assert that the Act infringes on candidates'

12 right to access the primary election ballot, political parties' right to nominate their candidates

13 through the primary election, and voters' right to vote for and associate with candidates by voting

14 for them in the primary election.  (*Melendez* Mot. at 10-11, 14; *Griffin* Mot. at 6-8; *Koenig* Mot.

15 at 11-17; *Trump* Mot. at 10-13.)  Regardless of how the asserted rights are characterized,[11] the

16 alleged burden on them is slight because the Act does not exclude any class of candidates from

17 the ballot—*all* candidates are capable of complying with the Act.

18      In examining challenges to ballot-access requirements, courts "focus on the degree to which

19 the challenged restrictions operate as a mechanism to exclude certain classes of candidates from

20 the electoral process." *Clements v. Fashing*, 457 U.S. 957, 964 (1982).  The relevant inquiry is

21 whether the state's ballot-access requirements "seriously restrict the availability of political

22 opportunity." *Ariz. Green Party*, 838 F.3d at 989 (citation omitted); *De La Fuente v. Padilla*, 930

23 F.3d 1101, 1105 (9th Cir. 2019) ("To trigger strict scrutiny . . . [plaintiff] must first show that [the

24 law] 'seriously restrict[s] the availability of political opportunity.'").  Plaintiffs bear the "initial

25 burden" to make that showing. *Ariz. Libertarian Party*, 798 F.3d at 731.  They cannot do so here.

26 _____

27      [11] While described variously as ballot-access rights, associational rights, or voting rights,
   these rights are interrelated, and the *Burdick* balancing test applies the same way in each instance.
   *Burdick*, 504 U.S. at 438 (citing *Bullock v. Carter*, 405 U.S. 134, 143 (1972) ("[T]he rights of

28 voters and the rights of candidates do not lend themselves to neat separation.")).

14

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477-19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

The Act does not seriously restrict the "availability of political opportunity" to any class of candidates. To the contrary, *all* candidates, regardless of their political belief or party affiliation or level of income, are able to disclose their financial interests. As the Fifth Circuit has held, financial disclosure requirements "do not limit the choices of any particular group of voters." *Plante v. Gonzalez*, 575 F.2d 1119, 1126-27 (5th Cir. 1978) (upholding the constitutionality of Florida's financial disclosure law, which required candidates for constitutional offices to submit the most recent copy of their federal tax return or a sworn statement that identified each separate source and amount of income that exceeded $1,000). Financial disclosure requirements are unlike loyalty oaths, which deny representation to groups with beliefs that could not be squared with the oath involved, or filing fees, which deny ballot access to poorly financed candidates. *Id.* at 1126 (citing *Communist Party of Indiana v. Whitcomb*, 414 U.S. 441 (1974), *Lubin v. Panish*, 414 U.S. 709 (1974), and *Bullock*, 405 U.S. at 144 (invalidating filing-fee scheme that "falls with unequal weight on voters, as well as candidates, according to their economic status")). In particular, the Fifth Circuit reasoned that there was no basis to suggest that "those most sensitive to their privacy will be Republicans or Democrats, liberals or conservatives, blacks or whites." *Id.* at 1127.[12]

Plaintiffs assert that the Act severely burdens prospective 2020 presidential candidates De La Fuente and President Trump because they will not submit their tax returns to the California Secretary of State, and therefore, will not be placed on California's primary election ballot. However, if these candidates are precluded from appearing on the primary ballot, it would be because of their deliberate refusal to comply with the same financial disclosure requirement that applies to all candidates, not from any burden placed on them by the Act.[13] For the same reason,

---

[12] The court in *Plante* noted that the Supreme Court had either dismissed an appeal, which is a disposition on the merits, or denied a petition for certiorari in four cases from state supreme courts that upheld extensive financial disclosure requirements for candidates, which "caution[ed]" "against finding the [Florida financial disclosure law] unconstitutional." *Plante*, 575 F.2d at 1125-26 (citing *Montgomery Co. v. Walsh*, 336 A.2d 97 (Md. 1975), *app. dism'd*, 424 U.S. 901 (1976); *Illinois State Employees Ass'n v. Walker*, 315 N.E.2d 9 (Ill. 1974), *cert. denied, sub nom. Troopers Lodge No. 41 v. Walker*, 419 U.S. 1058 (1974); *Fritz v. Gorton*, 517 P.2d 911 (Wash. 1974), *app. dism'd*, 417 U.S. 902 (1974); *Stein v. Howlett*, 289 N.E.2d 409 (Ill. 1972), *app. dism'd*, 412 U.S. 925 (1973)).

[13] Of course, these candidates would still need to comply with other requirements for placement on the presidential primary election ballot. *See* Cal. Elec. Code § 6000.1, *et seq.*

1   the other plaintiffs' alleged inability to associate with or vote for these prospective presidential

2   candidates is not caused by the Act, but by those candidates' refusal to comply with the Act.

3   These other plaintiffs' claims are therefore contingent upon the actions of candidates.

4         Furthermore, that two individual candidates might choose not to comply with an even-

5   handed, politically-neutral financial disclosure requirement that *all* candidates are *able* to comply

6   with does not mean that the Act severely burdens their First Amendment rights.  Nor would it

7   make sense to say that voters' rights are severely burdened by a law that the individual candidates

8   easily could, but simply refuse to, comply with.   For example, in *De La Fuente*, the plaintiff

9   challenged California's requirement that independent presidential candidates collect signatures

10   from one percent of the state's registered voters to appear on the general election ballot.  *De La*

11   *Fuente*, 930 F.3d at 1103-04.  The plaintiff argued that the law was a "cost prohibitive" obstacle

12   that severely burdened his right to access the ballot under the First Amendment. *Id.* at 1103-04.

13   The Ninth Circuit disagreed.  The court held that simply because an individual candidate might

14   not be able to fulfill the requirement does not mean that California's overall scheme severely

15   impairs ballot access.  *Id.* at 1105 (citing *Ariz. Libertarian Party v*, 798 F.3d at 730 (9th Cir.

16   2015) ("[Courts] must examine the entire scheme regulating ballot access.")).

17         Similarly, California's election law permits all recognized presidential candidates, as

18   defined in California Elections Code § 6000.1, to be listed on the primary election ballot if they

19   submit the required paperwork, *id.* § 6000.2, and authorize the Secretary of State to release their

20   tax returns, *id.* §§ 6883, 6884.  Simply because two individual candidates choose not to disclose

21   financial information that is readily available to them—as presidential candidates have done

22   routinely for decades—does not mean the law severely burdens their ballot-access rights, or the

23   rights of political parties to associate with them, or the rights of voters to vote for them.

24         The fact that the Act applies even-handedly to all presidential primary candidates further

25   distinguishes this case from others where courts have found the imposition of a severe burden and

26   applied strict scrutiny.  *See De La Fuente*, 930 F.3d at 1106 (citations omitted).  While some

27   plaintiffs characterize the Act as targeting Republican candidates, the Act applies to all

28   candidates, regardless of political belief or affiliation.  Indeed, as some plaintiffs point out, Jerry

16

1  Brown, California's former four-term Democratic governor, did not disclose his tax returns when

2  he ran for president in 1992 (*Melendez* Mot. at 2-3), or when he ran for governor in 2010 and

3  2014. (*De La Fuente* Mot. at 20). If the Act had been in effect in those years, he would not have

4  been placed on the primary election ballot, regardless of his party affiliation. The *Trump*

5  Plaintiffs argue that the Act is not even-handed because it applies only to primary election

6  candidates, whereas independent presidential candidates (who do not run in primary elections)

7  need not disclose their tax returns. (*Trump* Mot. at 11.) But the Act focuses only on the primary

8  election and as to that, it is politically neutral and even-handed. *See also* Section E *infra*

9  (discussing plaintiffs' equal-protection claims).

10      The *Trump* Plaintiffs also suggest in passing that the Act would burden taxpayer privacy.

11  (*Trump* Mot. at 11.) The Fifth Circuit, however, rejected an argument that financial privacy

12  outweighed the need for Florida's disclosure requirements, holding that "[o]ur society has long

13  regulated people's finances." *Plante*, 575 F.2d at 1132. The government commonly directly

14  regulates "the ability of the individual to order his financial affairs." *Id.* at 1131. "The indirect

15  effects caused by financial disclosure pale by comparison." *Id.* There is no basis for

16  distinguishing *Plante* on this point. *See also Barry v. City of New York*, 712 F.2d 1554, 1562 (2d

17  Cir. 1983) (holding that the right of privacy does not protect "public employees from the release

18  of financial information that is . . . indicative of a possible conflict of interest," and that "the

19  City's interest in public disclosure outweighs the possible infringement of plaintiffs' privacy

20  interests"); *Duplantier v. United States*, 606 F.2d 654 , 669 (5th Cir. 1979) (holding that EIGA's

21  financial-disclosure requirements for federal judges do not violate their right of privacy); *cf.*

22  *O'Brien v. DiGrazia*, 544 F.2d 543, 545-46 (1st Cir. 1976) ("Privacy in the sense of freedom to

23  withhold personal financial information from the government or the public has received little

24  constitutional protection."), *cert. denied sub nom. O'Brien v. Jordan*, 431 U.S. 914 (1977).

25      Despite plaintiffs' contentions to the contrary, any burden imposed by the Act is minimal.

26  Indeed, compliance with the Act is less burdensome than compliance with EIGA, which, to

27  defendants' knowledge, has never been challenged by any of the plaintiffs in these cases. The

28  candidates' tax returns are already prepared and can easily be redacted and provided to the

1   California Secretary of State, whereas EIGA requires presidential candidates to prepare an

2   extensive, complex worksheet using information from a number of other sources.  *See El-Amin v.*

3   *State Bd. of Elec.*, 717 F. Supp. 1138, 1141 (E.D. Va. 1989) (holding that the "magnitude" of the

4   alleged burden on associational rights caused by the state's fixed deadline by which candidates

5   must file financial disclosure statements "is small indeed, for candidates can avoid their unofficial

6   fate simply by filing the form sometime during the first six months of election year").

7      Further, compliance with the Act is not appreciably more burdensome than compliance

8   with EIGA which the *Trump* Plaintiffs describe as requiring "extensive" disclosures.  (Trump

9   Mot. at 13; see 5 U.S.C. App. 4 § 101(c)).[14]  President Trump's 2015 and 2016 candidate

10  disclosures "spanned over 90 pages and contained hundreds of lines listing assets and income,

11  bank accounts and investments, financial transactions, liabilities, and the ownership structure of

12  his companies."  (*Trump* Mot. at 13.)  And, in certain respects, candidates' financial disclosure

13  obligations under EIGA are more extensive than those under the Act.  For instance, EIGA

14  requires presidential candidates to disclose their interest in property exceeding a fair market value

15  of $1,000, 5 U.S.C. App. 4 § 101(a)(3), and liabilities owed to any creditor exceeding $10,000, *id.*

16  § 101(a)(4).  This information would generally not be disclosed in tax returns.  Yet, no plaintiff

17  suggests that EIGA imposes any burden on their First Amendment rights.  And neither De La

18  Fuente nor President Trump suggests that he would not comply with his disclosure obligations

19  under EIGA.

20

21      [14] EIGA requires the disclosure of any source, type, and amount or value of income from
22  any source (other than federal employment) and non-investment income over $200; any business
    assets exceeding $1,000 or income-generating activities over $200; agreement to participating in
23  employee benefit plan, future employment, or severance payments; any source (other than the
    federal government) that paid more than $5,000 for the candidate's services; each source of
24  earned income for the candidate's spouse over $1,000; each asset related to the candidate's
    spouses' employment, business activities, or other income-generating activities (other than
25  income from the federal government); any other asset held for investment or income with a value
    greater than $1,000 or from which more than $2000 in income was received; any purchase, sale,
26  or exchange of real property or securities more than $1,000 by the candidate, or the candidate's
    spouse or dependent child; liabilities over $10,000 owed by the candidate, or the candidate's
27  spouse or dependent child; and gifts or travel reimbursements over $390 received by the
    candidate, or the candidate's spouse or dependent child; among other financial information.  *See* 5
28  USC App. 4 § 102(b).  The candidates may disclose the amount of value of any item in exact
    dollar amount or in categories of amount range.  *Id.* § 102(b)(2)(B).

18

1    Plaintiffs' reliance on *Matsumoto v. Pua*, 775 F.2d 1393 (9th Cir. 1985) is also misplaced.

2    (*Trump* Mot. at 12; *Griffin* Mot. at 7.)  There, the court held that a law that barred recalled

3    officials from running for any city election for two years imposed a severe burden on the rights of

4    recalled officials and their supporters.  *Matsumoto*, 775 F.2d at 1396.  The court reasoned that

5    because city elections were held at four-year intervals, the law, in effect, prevented the recalled

6    council members from running again for five years.  *Id.*  The court further questioned how the law

7    might advance the political process by preventing an official who was recalled because of an

8    unpopular opinion from seeking any elective office for two years.  *Id.*  In sharp contrast to the law

9    challenged in *Matsumoto*, the Act does not directly prohibit any candidate from being placed on

10   the ballot.  To the contrary, all presidential candidates can comply with the Act and, meeting all

11   other requirements, be placed on the primary election ballot.

12   Finally, *Cook v. Gralike*, 531 U.S. 510 (2001) has no relevance here.  (*Melendez* Mot. at

13   12.)  In *Cook*, a provision of the Missouri Constitution required that the statement "DECLINED

14   TO PLEDGE TO SUPPORT TERM LIMITS" be printed on all primary and general election

15   ballots adjacent to the name of every non-incumbent congressional candidate who refused to take

16   a pledge to support term limits if elected to office.  *Id.* at 515.  The Supreme Court held that the

17   challenged state constitutional provision violated the Elections Clause, because it attempted to

18   "dictate electoral outcomes."  *Id.* at 526.  The Court did not address whether it violated the First

19   Amendment, so the case is inapposite.  It is also clearly distinguishable.  Unlike the requirement

20   at issue in *Cook*, the Act does not "dictate electoral outcomes" in the guise of educating voters; it

21   does not provide any candidate on the primary ballot an unfair advantage or disadvantage.

3.    **The Act furthers the State's compelling interests, which outweigh the slight burden on plaintiffs' asserted rights.**

24   Any slight burden imposed by the Act on plaintiffs' asserted rights is justified by

25   important—indeed compelling—state interests.  California has a compelling interest in ensuring

26   that its voters have fulsome and accurate information about the financial interests and business

27   dealings of presidential primary candidates so that they may make informed decisions.  Indeed,

28

1  "[a]n informed public is essential to the nation's success, and a fundamental objective of the First

2  Amendment." *Barry*, 712 F.2d at 1560 (internal citation and quotation omitted).

3       Financial information about presidential candidates, in particular, is critically important to

4  ensuring an informed electorate.  Congress recognized this by requiring presidential candidates to

5  provide extensive financial disclosures under EIGA.  5 U.S.C. app. 4 § 101, *et seq*.  Courts have

6  similarly recognized that financial disclosure laws "derive considerable strength from the benefits

7  widely felt to be derived from openness and from an informed public."  *Barry*, 712 F.2d at 1560;

8  *see also Plante*, 575 F.2d at 1137 (public disclosure of financial information about candidates

9  "serves one of the most legitimate of state interests").  Indeed, it furthers "[o]ne goal of the First

10  Amendment," which "is to ensure that the individual citizen has available all the information

11  necessary to allow him to properly evaluate speech."  *Fed. Election Comm'n v. Furgatch*, 807

12  F.2d 857, 862 (9th Cir. 1987).

13       In *Barry*, the Second Circuit upheld a financial disclosure law enacted by New York City

14  that required candidates for City offices to publicly disclose "extensive information about their

15  personal finances," including sources of income (their own and their spouse's), sources of capital

16  gains, sources of gifts or honoraria, indebtedness, and the nature of their investments.  712 F.2d at

17  1556-1557, 1560.  The court held that the disclosure law "plainly furthers a substantial, possibly

18  even a compelling, state interest" in "deter[ring] corruption and conflicts of interest among City

19  officers and employees, and to enhance public confidence in the integrity of its government."  *Id.*

20       Cases in the campaign-finance disclosure context have been particularly clear about the

21  compelling state interest in providing the electorate information about candidates' finances and

22  those of their campaigns.  "Providing information to the electorate is vital to the efficient

23  functioning of the marketplace of ideas, and thus to advancing the democratic objectives

24  underlying the First Amendment."  *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1005

25  (9th Cir. 2010).  "In a republic where the people are sovereign, the ability of the citizenry to make

26  informed choices among candidates for office is essential."  *Buckley v. Valeo*, 424 U.S. 1, 14-15

27  (1976) (*per curiam*), *superseded on other grounds* in *McConnell v. Fed. Elec. Comm'n*, 540 U.S.

28  93 (2003); *see id.* at 67-68 (holding that government has a substantial interest in requiring

20

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1    candidates to disclose the source of campaign contributions to provide the electorate with

2    information about the interests to which a candidate is most likely to be responsive," to "deter

3    actual corruption and avoid the appearance of corruption," and "to detect violations of the

4    contributions limits"). The "vital provision of information [to the electorate] repeatedly has been

5    recognized as a sufficiently important, if not compelling, governmental interest." *Human Life*,

6    624 F.3d at 1005.

7        The *Trump* Plaintiffs argue the Act is unnecessary to inform California voters about

8    potential conflicts of interests or other improprieties because presidential candidates must provide

9    extensive financial disclosures under EIGA. (*Trump* Mot. at 13.) However, this ignores that

10   EIGA does not require disclosure until May 15 of the election year—two months *after*

11   California's primary election, which takes place in March. 5 U.S.C. App. 4 § 101(c). EIGA,

12   which contains some, but not all, of the information in tax returns, is not substitute for the Act.

13       The *Trump* Plaintiffs further suggest that the Act does not serve California's interests

14   because it applies only to candidates appearing on the primary ballot, and not the general election

15   ballot. (*Trump* Mot. at 12.) But the Legislature may effect reform "one step at a time, addressing

16   itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v.*

17   *Lee Optical of Ok. Inc.*, 348 U.S. 483, 465 (1955). As the Ninth Circuit recognized in *De La*

18   *Fuente*, the last time an independent presidential candidate appeared on California's general

19   election ballot was 1992 (not including write-in candidates). 930 F.3d at 1105. Thus, it is

20   overwhelmingly likely that presidential candidates appearing on the general election ballot will

21   have first run in the primary. Given that reality, it was perfectly reasonable for the Legislature to

22   pass legislation aimed at ensuring that primary voters are adequately informed about the

23   candidates' financial interests and business dealings. *See also* Section E *infra* (discussing

24   plaintiffs' equal-protection claim).

25       The *Griffin* Plaintiffs' argument citing *Anderson*, 460 U.S. at 794–95, that California has a

26   less important interest in regulating presidential elections than statewide or local elections is also

27   unavailing. (*Griffin* Mot. at 8.) *Anderson* addressed an early filing deadline for independent

28   candidates for the *general* election, where, as the Court described, the outcome would be largely

21

1    determined by voters outside the state.  460 U.S. at 795.  In contrast, the Act regulates only

2    California's *primary* election, in which the California's political parties select their preferred

3    presidential candidates.  *See, e.g.*, Cal. Elec. Code §§ 6002 (Democratic Presidential Primary),

4    6470 (Republican Presidential Primary).  The result of the primary election is determined only by

5    in-state voters.  Thus, *Anderson* is plainly distinguishable.  *See Public Integrity Alliance, Inc.*, 836

6    F.3d at 1027 (noting "decades of jurisprudence permitting voting restrictions in primary elections

7    that would be unconstitutional in the general election" because "primaries serve a different

8    function than general elections," and that "legitimate state interests" in primary elections "are not

9    identical to those pertinent to the general election").

10        In sum, because the compelling and weighty state interests served by the Act far outweigh

11    the slight burden on plaintiffs' asserted rights, plaintiffs have no likelihood of success on the

12    merits of their claims.

13         **D.**     **The Act Does Not Violate Plaintiff De La Fuente's First Amendment Right**

14                **Against Compelled Speech.**

15        The Supreme Court has held that a "compelled speech" violation can occur only if the

16    conduct in question was actually speech—only then may a violation result "from the fact that the

17    complaining speaker's own message was affected by the speech it was forced to accommodate."

18    *Rumsfeld v. Forum for Academic & Institutional Rights (FAIR), Inc.,* 547 U.S. 47, 63-66 (2006).

19    Here, neither a matter of opinion nor a particular viewpoint is at issue, and there is nothing

20    "inherently expressive" in a candidate's compliance or non-compliance with the Act, or in a

21    candidate's tax returns.  *See id.* at 64 (law requiring schools to offer military recruiters the same

22    access to students as nonmilitary recruiters for school to receive federal funding did not affect

23    "inherently expressive" conduct).  The Act requires disclosure only of factually neutral, non-

24    expressive, and presumably truthful information which cannot result in the candidates' "own

25    message [being] affected by the speech [they were] forced to accommodate." *Id.* at 63.  Indeed,

26    the financial information that must be disclosed under the Act was provided by the candidates

27    *themselves* to the taxing authorities.  Moreover, if the Act compels speech in violation of the First

28

22

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1   Amendment, EIGA would pose the same First Amendment problem.  Yet—as with their other

2   claims—no plaintiff in this case has suggested as much; indeed, they argue that EIGA's

3   disclosure requirements are an adequate substitute for the Act.

4        De La Fuente's reliance on *Riley v. National Federation of the Blind of North Carolina,*

5   *Inc.*, 487 U.S. 781 (1988), is unavailing.  (*De La Fuente* Mot. at 24-25.)  In *Riley*, the Supreme

6   Court struck down the North Carolina Charitable Solicitations Act, which set limits on fees

7   collected by professional fundraisers out of charitable contributions, and required fundraisers to

8   affirmatively disclose to potential donors the percentage of fees collected in prior solicitations.

9   487 U.S. at 784–801.  As was well-established in the Court's precedent, charitable solicitations

10  "involve a variety of speech interests . . . that are within the protection of the First Amendment."

11  *Id.* at 788.  Thus, the "regulation of a solicitation 'must be undertaken with due regard for the

12  reality that solicitation is characteristically intertwined with informative and perhaps persuasive

13  speech.'"  *Id.* at 796 (quoting *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620,

14  632 (1980)).  Further, the "predictable result" of the compelled disclosure at issue would be to

15  discourage fundraisers from "engaging in solicitations that result in an unfavorable disclosure."

16  *Id.* at 800.  The Court therefore concluded that the law was subject to "exacting First Amendment

17  scrutiny," and that North Carolina's attempt to prophylactically prevent charities from speaking at

18  all unless they conveyed the state's required message was not "narrowly tailored" to the state's

19  interest in protecting the public.  *Id.* at 798–801.

20       Here, by comparison, California is not requiring candidates to "speak" or communicate

21  any particular message, let alone one that is likely to deter plaintiff De La Fuente or any other

22  presidential candidate from engaging in protected First Amendment activity.  The information

23  that must be disclosed has already been prepared for and disclosed to the taxing authorities and

24  can be easily released to the public; it is purely factual and non-controversial (and presumably

25  truthful); it is not intertwined with other speech; and presidential candidates have been routinely

26  disclosing it for nearly 50 years.  Unlike the North Carolina statute in *Riley*, the Act is narrowly

27  tailored to achieve California's interest in educating voters, and merely codifies a standard

28  already adhered to by most candidates and presidents for many decades.

23

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

This case also bears no resemblance to *West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943) or *Wooley v. Maynard*, 430 U.S. 705 (1977).  (*See De La Fuente* Mot. at 23-24.) In *West Virginia Board of Education*, the Supreme Court held unconstitutional a state law compelling students to salute the flag and recite the Pledge of Allegiance in schools.  319 U.S. at 642.  The Court reasoned that "a ceremony so touching matters of opinion and political attitude may [not] be imposed upon the individual by official authority under powers committed to any political organization under our Constitution."  *Id.* at 636.  The Court in *Wooley* struck down a New Hampshire law requiring vehicles to bear license plates with the state motto "Live Free or Die."  *Wooley*, 430 U.S. 705.  The Court reasoned that "a state measure which forces an individual . . . to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable" invades the sphere protected by the First Amendment.  *Id.* at 714–15. Even broadly construed, the holdings of both *Barnette* and *Wooley* are limited to compelled speech that affects the content of the speaker's message by touching on matters of opinion, or compelling the speaker to endorse a particular viewpoint.  The Act does no such thing.  It is neutral, does not force the adoption or articulation of any state-sponsored ideology, and does not affect the content of the purported speaker's message by touching on matters of opinion.

In sum, "compelled speech" is not at issue here because the Act does not require disclosure of any matter of opinion or viewpoint, nor does it "regulate conduct that communicates a message or that has an expressive element."  *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 895 (9th Cir. 2018), *cert. denied* 139 S.Ct. 2744 (2019).  De La Fuente's compelled-speech claim has no likelihood of success on the merits.

### E.   The Act Does Not Violate the Equal Protection Clause.

#### 1.   The Act does not unconstitutionally discriminate against partisan candidates in favor of independent candidates.

In alleging that the Act violates the Equal Protection Clause, the *Griffin* and *Melendez* Plaintiffs contend the Act unfairly disadvantages political party candidates, who appear on the

24

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1  primary ballot, in favor of independent candidates, who do not.  (*Melendez* Mot. at 16; *Griffin*

2  Mot. at 11.)  The Ninth Circuit has already rejected the same theory of unconstitutionality.

3  In *Van Susteren v. Jones*, 331 F.3d 1024, the plaintiff challenged California's disaffiliation

4  requirement, which required partisan candidates to have been disaffiliated from membership in

5  other political parties for one year before filing for primary ballot access.  *Id.* at 1025.  The

6  plaintiff asserted that the disaffiliation provision violated the Equal Protection Clause because it

7  treated partisan and independent candidates differently.  *Id.* at 1026.  The Ninth Circuit held that

8  to successfully challenge the requirement on equal-protection grounds, plaintiff "must establish

9  that the two groups, partisan and independent candidates, are similarly situated with respect to the

10  routes they must take to get to the general election ballot."  *Id.* at 1027.  However, "[t]hese two

11  groups are not similarly situated."  *Id.*  "Party candidates must run in a primary election, which is

12  integral to the election process because it serves the important function of winnowing out

13  competing partisan candidates."  *Id.* (citing *Storer v. Brown*, 415 U.S. 724, 735 (1974)).  "By

14  contrast, an independent candidate need not, and indeed may not, participate in a party primary in

15  order to be on the general election ballot."  *Id.* (citation omitted).

16  Here too, contrary to plaintiffs' theory, partisan and independent candidates are not

17  "similarly situated with respect to the routes they must take to get on the general election ballot."

18  The Act only applies to candidates running in the primary, not independent candidates.   This is in

19  keeping with California's important interests in regulating primary elections.  *See Democratic*

20  *Party of U.S. v. Wis.*, 450 U.S. 107, 126 n.28 (1981) ("Obviously, States have important interests

21  in regulating primary elections, [citation].  A state, for example, 'has an interest, if not a duty, to

22  protect the integrity of its political processes from frivolous or fraudulent candidacies.'"); *Storer*,

23  415 U.S. at 735 ("The direct party primary in California is not merely an exercise or warm-up for

24  the general election but an integral part of the entire election process. . . .  It functions to winnow

25  out and finally reject all but the chosen candidates.").  At the general election stage, where

26  independent and partisan candidates compete, the Act does not impose any requirements on them.

27  Therefore, there is no equal-protection violation.

28

2. **The Act does not otherwise violate the Equal Protection Clause.**

The *Griffin* Plaintiffs further argue that the Act discriminates against voters who support candidates who will not release their tax returns (and therefore will not appear on the primary ballot).  (*Griffin* Mot. at 11.)  This just repackages their associational rights claim, which, as described above, has no likelihood of success on the merits.  The *Griffin* Plaintiffs do not make separate arguments in support of this equal-protection theory, and the Ninth Circuit has held that where an equal-protection claim is based on an alleged violation of First Amendment rights, as here, "it is unnecessary to conduct a separate equal protection analysis."  *Orin v. Barclay*, 272 F.3d 1207, 1213 n. 3 (9th Cir. 2001)).

**F.   The Act Is Not Preempted by EIGA.**

The *Trump* Plaintiffs' contention that EIGA expressly preempts the Act has no likelihood of success on the merits.  (*Trump* Mot. at 13.)  Unlike bona fide preemption clauses, the provision they cite, 5 U.S.C. App. 4 § 107(b), makes no explicit reference to preemption or state law, and EIGA's statutory history clearly confirms that Congress did not intend to preempt state law. Further, the *Trump* Plaintiffs cite no cases holding that EIGA preempts state law in this context, and the State Defendants are aware of none.

The key question in analyzing preemption is congressional intent.  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  Moreover, in all preemption cases, "and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied," courts start "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Id.* (internal citation and punctuation omitted).  If the federal statute contains an express preemption clause, federal courts must ascertain the substance and scope of the clause.  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).  Given the presumption against preemption noted above, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption."  *Id.* at 77 (citing *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

EIGA, as noted above, requires the President and presidential candidates, among other federal employees, to file financial disclosure reports.  5 U.S.C. App. 4 § 101(c), (f).  Candidates for nomination or election to the Office of the President must file the required report with the Federal Election Commission by May 15 of the election year.  *Id.* § 103(c).

The *Trump* Plaintiffs point to no statutory language in EIGA constituting an express preemption clause.  (*Trump* Mot. at 13-14.)  Instead, they rely on 5 U.S.C. App. 4 § 107(b), which states that the "provisions of this title requiring the reporting of information shall *supersede any general requirement* under any other provision of law or regulation with respect to the reporting of information required for purposes of preventing conflicts of interest or apparent conflicts of interest."  (Emphasis added.)  This provision, however, makes no specific reference to preemption or state law.  In some cases, courts have found preemption where federal law expressly "superseded" other requirements, but only where Congress's intent to preempt was unmistakable in light of the surrounding text.  *See*, *e.g. Int'l Franchise Ass'n, Inc. v. City of Seattle*, 97 F. Supp. 2d 1256, 1282 (W.D. Wash. 2015) (finding preemption where "ERISA [Employment Retirement Income Security Act] *preempts and supersedes any and all state laws* that 'relate to' any employee benefit plan") (emphasis added); *Asis Internet Servs. v. Consumerbargaingiveaways, LLC*, 622 F. Supp. 2d 935, 940 (N.D. Cal. 2009) (finding preemption where CAN-SPAM Act "supersedes *any statute, regulation, or rule of a State or political subdivision of a State*") (emphasis added).  Not surprisingly, the *Trump* Plaintiffs point to no case holding that EIGA preempts state law.  *Trump* Mot. at 13-14.

The statutory history of EIGA clearly confirms that the language cited by the *Trump* Plaintiffs is not language of preemption.  When EIGA was enacted in 1978, it provided different disclosure requirements for officers and employees in the three different branches of the federal government in different titles of the act.  Title I applied to legislative personnel, Title II to executive personnel, including presidential candidates, and Title III to judicial personnel.  *See* Ethics in Government Act of 1978, Pub. L. No. 95-521, §§ 101, 201, 301, 92 Stat. 1824 (1978).  Title II, which applied to presidential candidates, contained the same language that the *Trump* Plaintiffs incorrectly claim to be an express preemption clause: "The provisions of this title

27

1  requiring the reporting of information shall supersede any general requirement under any other

2  provision of law or regulation with respect to the reporting of information required for purposes

3  of preventing conflicts of interest or apparent conflicts of interest." *Id.* § 207(c).  In contrast,

4  Title I, which applied to legislative personnel, contained an actual express preemption clause:

5  "The provisions added by *this title*, // [former] 2 USC 708. // and the regulations issued

6  thereunder, shall supersede *and preempt any State or local law* with respect to financial

7  disclosure by reason of candidacy for Federal office or employment by the United States

8  Government." *Id.* § 108 (emphasis added).  However, when Congress amended EIGA in 1989, it

9  adopted the language in former Title II, *not* Title I.  Ethics Reform Act of 1989, Pub. L. No. 101-

10  194, § 107(b), 103 Stat. 1716 (1989).  This history clearly demonstrates that when it amended

11  EIGA, Congress deliberately chose *not* to "supersede and preempt any State or local law."

12        Accordingly, the *Trump* Plaintiffs cannot show a likelihood of success on the merits of

13  their preemption claim under EIGA.

14        **G.**    **The Act Does Not Violate, and Is Not Preempted by, the Internal Revenue Code.**

15

16        Plaintiff De La Fuente's claim that the Act is preempted by the Internal Revenue Code, 26

17  U.S.C. § 6103, has no likelihood of success.  While characterized as a "preemption" claim, it

18  really seems to be based on a contention that 26 U.S.C. § 6103 does not "authorize" California to

19  pass the Act.  (*De La Fuente* Mot. at 22.)  No such authorization is required under principles of

20  federalism.  In the federal system, the states retain all powers not delegated by the Constitution to

21  the United States or prohibited by the Constitution.  *See, e.g., Murphy v. Nat'l Collegiate Athletic*

22  *Ass'n*, 138 S. Ct. 1461, 1475–76 (2018); *Printz v. United States*, 521 U.S. 898, 918 (1997).  With

23  respect to tax returns, nothing in the Constitution removes California's authority to require their

24  disclosure as a condition of appearing on the presidential primary ballot.

25        Even viewing it as a preemption claim, it still fails.  26 U.S.C. § 6103 neither expressly

26  nor impliedly preempts the Act.  Like EIGA, 26 U.S.C. § 6103 does not have an express

27  preemption provision.  De La Fuente nonetheless asserts that the Act is preempted because it

28  "conflicts" with 26 U.S.C. § 6103(a).  (*Del La Fuente* Mot. at 22-23.)  It does not.  Conflict

28

Omnibus Opp'n to Mots. Preliminary Inj. (2:19-cv-1477/19-cv-1501/19-cv-1506/19-cv-1507/19-cv-1659-MCE-DB)

1   preemption is a form of implied preemption, which occurs where "there is actual conflict between

2   state and federal law." *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1040 (9th Cir. 2015).  It arises

3   "when (1) compliance with both federal and state regulations is a physical impossibility, or (2)

4   when state law 'stands as an obstacle to the accomplishment and execution of the full purposes

5   and objectives of Congress." *Id.* (citation and internal punctuation marks omitted).  Neither

6   applies here because 26 U.S.C. § 6103(a) does not preclude the voluntary disclosure of tax

7   documents to third parties or the public by a taxpayer.  Indeed, § 6103(c) expressly provides that

8   the Treasury Secretary may disclose a taxpayer's tax returns with the taxpayer's consent.  For

9   over four decades, presidential candidates have voluntarily disclosed their tax information.  And

10  taxpayers routinely disclose their tax returns for mortgage applications and other purposes.

11       Under the Act, taxpayers who wish to be placed on the California primary election ballot

12  for President must provide consent to having a redacted version of their tax returns disseminated

13  to California voters.  Cal. Elec. Code § 6884(a)(2).  Because consent is provided, there is no

14  conflict with § 6103.

15       That candidates must provide consent to appear on the primary ballot does not change the

16  analysis.  In *Lomont v. Summers*, the plaintiffs brought a preemption challenge to regulations that

17  required applicants to submit certain tax forms to law enforcement officers before manufacturing

18  or transferring specified firearms.  *Lomont v. Summers*, 135 F. Supp. 2d 23, 24 (D.D.C. 2001),

19  *aff'd sub nom. Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002).  The district court considered and

20  rejected the same argument made by Plaintiff *De La Fuente* here, holding there was no conflict

21  with § 6103 because it was the applicants' "choice, and only their choice," that resulted in their

22  tax information being disclosed to law enforcement.  *Id.* at 26; *see United States v. Sheriff, City of*

23  *N.Y.*, 330 F.2d 100, 101 (2d Cir. 1964) (holding that the disclosure by the taxpayer of his returns

24  to a grand jury is not an unauthorized disclosure under 26 U.S.C. § 6103, "even though it be made

25  by reason of legal compulsion").  Similarly here, it is the presidential candidates' choice, and

26  only their choice, to run in the presidential primary that subjects them to the Act's requirements.

27

28

29

1  **II.     IN THE ABSENCE OF ANY CONSTITUTIONAL VIOLATION, PLAINTIFFS CANNOT
2            SHOW IRREPARABLE HARM.**

3          In the absence of any likely constitutional violation or preemption, plaintiffs cannot show

4  irreparable harm.[15]  And the non-candidate plaintiffs' purported harm is derived from and

5  contingent on the candidates' choices, not from the Act.  They cannot show the Act causes them

6  irreparable harm.

7  **III.    PLAINTIFFS CANNOT MEET THEIR BURDEN TO SHOW THAT THE BALANCE OF
8            EQUITIES AND THE PUBLIC INTEREST TIP IN THEIR FAVOR.**

9          In exercising sound discretion, a district court "must balance the competing claims of

10  injury and consider the effect of granting or withholding the requested relief," paying "particular

11  regard for the public consequences in employing the extraordinary remedy of injunction."

12  *Winter*, 555 U.S. at 24 (quotation marks and citation omitted).  "The public interest analysis for

13  the issuance of a preliminary injunction requires [the Court] to consider whether there exists some

14  critical public interest that would be injured by the grant of preliminary relief."  *Indep. Living*

15  *Ctr., So. Cal. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009), *vacated and remanded on*

16  *other grounds,* 132 S. Ct. 1204 (2012).

17          Plaintiffs cannot establish harm sufficient to outweigh the fact that "[a]ny time a State is

18  enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a

19  form of irreparable injury."  *Abbott v. Perez*, 138 S.Ct. 2305, 2324 n.17 (2018) ("the inability to

20  enforce its duly enacted plans clearly inflicts irreparable harm on the State") (citation omitted).

21  An injunction prohibiting the enforcement of the Act would be against the public interest because

22  it would deprive voters of critical information about presidential candidates running in the

23  primary.  As the Legislature found, "California has a strong interest in ensuring that its voters

24  make informed, educated choices in the voting booth."  Cal. Elec. Code § 6881.  A "Presidential

25  candidate's income tax returns provide voters with essential information regarding the candidate's

26  potential conflicts of interest, business dealings, financial status, and charitable donations.  The

27  _____

28  [15] Additionally, plaintiffs Bolotin and Oerding cannot show irreparable harm because they
    have no standing to challenge the Act.  *See supra*, n. 4.

30

1    information in tax returns therefore helps voters to make a more informed decision." *Id.*  The

2    public "can better estimate the risks of any given Presidential candidate engaging in corruption or

3    the appearance of corruption if they have access to candidates' tax returns."  For these reasons,

4    the public interest would be harmed if enforcement of the Act is enjoined before the upcoming

5    2020 primary election.

6          Balancing these compelling public interests against plaintiffs De La Fuente and President

7    Trump's claimed harm in not being placed on California's primary election ballot if they choose

8    not to comply with the Act (and the other plaintiffs' alleged harms)—an alleged harm De La

9    Fuente and President Trump could cure by simply complying with the Act—the equities clearly

10   favor of the State Defendants.

11                                    **CONCLUSION**

12         For the reasons provided above, plaintiffs' motions for preliminary injunction in each of

13   the five related cases should be denied.

14
     Dated:  September 5, 2019                    Respectfully submitted,
15
16                                               XAVIER BECERRA
                                                 Attorney General of California
                                                 PAUL STEIN
17                                               Supervising Deputy Attorney General

18                                               */ s / Peter H. Chang*
                                                 PETER H. CHANG
19                                               Deputy Attorney General
                                                 *Attorneys for State Defendants*
20   SA20191026562

21

22

23

24

25

26

27

28

                                          31