UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERRY GRIFFIN, MICHELLE BOLOTIN, MICHAEL SIENKIEWICZ, AND JAMES B. OERDING, | No. 2:19-cv-01477-MCE-DB *(and related cases)* No. 2:19-cv-01501-MCE-DB No. 2:19-cv-01506-MCE-DB No. 2:19-cv-01507-MCE-DB No. 2:19-cv-01659-MCE-DB |
| Plaintiffs, | |
| v. | |
| ALEX PADILLA, in his official capacity as Secretary of State of California, | **AMENDED MEMORANDUM AND ORDER[1]** |
| Defendant. | |
| AND RELATED CASES. | |

On July 30, 2019, California Governor Gavin Newsom signed into law the

Presidential Tax and Transparency Act ("the Act"), enacted as Senate Bill 27, which

requires, among other things, presidential candidates in the California primary to have

disclosed their federal tax returns for the previous five years as a precondition to

appearing on the State's partisan primary ballot.[2] By way of the above-captioned related

---

[1] This Amended Memorandum and Order is identical to its predecessor, filed on October 1, 2019, except that it corrects a typographical error, found on page 9 of the original Order, to correctly state "three terms in the United States House of Representatives, or two terms in the United States Senate. . ." See Am. Mem. and Order, 10:1-2. That correction does not change the substantive decision of this Court in any way.

[2] The Act was codified as Chapter 7 to Part 1 of Division 6 of the California Elections Code, §§ 6880 et seq.

actions, five sets of Plaintiffs seek to enjoin enforcement of that law by Defendants Governor Newsom, Alex Padilla, California's Secretary of State, and Xavier Becerra, in his capacity as California Attorney General.[3]  Plaintiffs are the incumbent President, Donald J. Trump, along with his reelection campaign, a second Republican candidate for President, Roque De La Fuente, both the Republican National Committee and its state counterpart, the California Republican Party, and eight individual California voters, including members of both the Republican, Democratic and Independent Parties.

According to all Plaintiffs, the Act violates the so-called Qualifications Clause of the United States Constitution.  U.S. Const., art, II, § 1, cl. 5 ("Qualifications Clause").  Four of the five lawsuits further allege that the Act violates Plaintiffs' First Amendment rights to associate and/or to access the ballot, also guaranteed by the United States Constitution.  In addition, two of the actions take the position that the Act also violates the Fourteenth Amendment's Equal Protection Clause.  Finally, the lawsuit filed on behalf of President Trump and his campaign asserts that the Act's provisions are preempted by the Ethics in Government Act of 1978, 5 U.S.C.A. App. 4, §§ 101 et seq. ("EIGA"), which requires that presidential candidates disclose certain financial information.

The Court heard oral argument on September 19, 2019, and, at the hearing's conclusion, announced its tentative decision granting a preliminary injunction enjoining application of the Act insofar as it pertains to presidential candidates.  This written order memorializes that ruling and supersedes any and all statements made by the Court at that time.  For the reasons set forth below, the requests for preliminary injunctive relief are GRANTED.

///

///

///

---

[3] Newsom, Becerra and Padilla will be collectively referred to in this Memorandum and Order as "Defendants" or the "State" unless otherwise noted.

2

**BACKGROUND**

In 1913, the Sixteenth Amendment to the United States Constitution was ratified authorizing a national income tax to be implemented through the filing of individual tax returns with the Internal Revenue Service.  Since that time, there has never been a legal requirement that any candidate for federal office disclose their tax returns as a precondition to standing for election.  The Act, which provides in relevant part as follows, attempts to change that:

> 6883.  (a) Notwithstanding any other law, the Secretary of State shall not print the name of a candidate for President of the United States on a primary election ballot, unless the candidate, at least 98 days before the presidential primary election, files with the Secretary of State copies of every income tax return the candidate filed with the Internal Revenue Service in the five most recent taxable years.

Cal. Elec. Code § 6883(a).  It goes on to require the Secretary of State to publish a copy of the candidate's personal tax returns on the Secretary's publicly available website, after redacting the returns for privacy purposes.  Id. at § 6884(c).  Because the Act applies only to primaries and not to the general election, however, independent and certified write-in candidates are not required to disclose their tax returns as a condition of running for President.  Id. at §§ 8300, 8600.

The California Legislature formally explained its justification for passing the Act in a purpose statement which reads:

> [The] State of California has a strong interest in ensuring that its voters make informed, educated choices in the voting booth.  To this end, the state has mandated that extensive amounts of information be provided to voters, including county and state voter information guide.  The Legislature also finds and declares that a Presidential candidate's income tax returns provide voters with essential information regarding the candidate's potential conflicts of interest, business dealings, financial status and charitable donations.

Id. at § 6881.  Despite this attempt to couch the Act as an informational device to be applied equally to all candidates, however, the legislative history and statements made by state legislators during its consideration strongly suggest it was primarily intended to

force President Trump to disclose his tax returns.[4]  Indeed, at oral argument counsel for the State expressly conceded that the Act "was prompted by President Trump's refusal to disclose his tax return when he ran for . . . office."  Transcript of September 19, 2019 hearing, ECF No. 37 to Case No. 19-cv-1477-MCE-DB, 55:12-15.  Likewise, State Senator Mike McGuire, who co-sponsored the Act in the California Senate, has unequivocally indicated that "it will make presidential tax returns public in [California] just in time for the 2020 election."  Pl. Melendez' Mot., 19-cv-01506-MCE-DB, ECF No. 17-1, at 5:26-27; 6:5-6.  McGuire has further stated that "President Trump, if he truly doesn't have anything to hide, should step up and release his tax returns."  Id. at 5:28-6:1.

Defendants also describe the Act as having been enacted in response to President Trump's "break" from "customary practice" in choosing not to disclose his returns.  See Defs.' Omnibus Opp, 3:22-24.  But such production has hardly been universal.  Between 1913, when income taxes were instituted, and 1973, when President Nixon opted to disclose his returns after portions were leaked, no sitting President elected to furnish his returns.  Melendez Mot. at 2:21-22.  In addition, Nixon's successor, Gerald Ford, opted to disclose only a summary of his taxes.  Id. at 2:25.  Nor have presidential candidates universally released their tax filings.  For example, in 1992, former California Governor Jerry Brown, then a candidate for the Democratic nomination for President, elected not to disclose his returns.  Ross Perot similarly declined to disclose that same year, and in 2000, Ralph Nader also decided against disclosure.  Id. at 2:28-3:8.  Consequently, the State's argument that the California Legislature passed the Act "to codify a custom followed by presidential candidates in the past five decades" is disingenuous.  Defs.' Opp., 1:6.

Against this backdrop, it is no surprise that the one other time California attempted to pass a law such as the one challenged here, shortly after President

---

[4] Trump has made extensive disclosures of his personal financial information in accordance with the provisions of EIGA, but has never disclosed his tax returns themselves.  Additionally, when he announced his candidacy for reelection in 2020, Trump reiterated that he would not disclose his filings prior to either the 2020 primary or general elections.  See Pl. Melendez' Mot., 19-cv-01506-MCE-DB, ECF No. 17-1, 6:12-17.

1    Trump's election, it was unsuccessful.  More specifically, in 2017, the California

2    Legislature passed a bill known as SB 149 that, like the Act, would have required

3    candidates to release their returns as a precondition for appearing on the California

4    primary ballot.  In analyzing that legislation before it came to a vote, however,

5    California's Office of the Legislative Counsel—a nonpartisan public agency— "concluded

6    that [SB 149] would be unconstitutional if enacted."  Cal. Comm. on the Judiciary Report,

7    Senate, March 11, 2019 at 5 (citing Ops. Cal. Legis. Counsel, No. 1718407 (Sept. 7,

8    2017)).  Regardless, the Legislature approved the bill anyway and sent it to then-

9    Governor Jerry Brown for his signature.  Governor Brown then vetoed the legislation,

10   articulating his many reservations as follows:

> This bill is a response to President Trump's refusal to release his returns during the last election.  While I recognize the political attractiveness – even the merits – of getting President Trump's tax returns, I worry about the political perils of individual states seeking to regulate presidential elections in this manner.  First, it may not be constitutional. Second, it sets a 'slippery slope' precedent.  Today we require tax returns, but what would be next?  Five years of health records?  A certified birth certificate?  High school report cards?  And will these requirements vary depending on which political party is in power?

18   Governor Jerry Brown, Governor's Veto Message, SB 149, available at

19   https://leginfo.legislature.ca.gov/faces/billStatusClient.xhtml?bill_id=201720180SB149.

20   He concluded that conditioning ballot access on the disclosure of tax returns might

21   infringe upon settled constitutional rights, stating that "[a] qualified candidate's ability to

22   appear on the ballot is fundamental to our democratic system."  Id.  Accordingly, he

23   "hesitate[d] to start down a road that well might lead to an ever escalating set of differing

24   state requirements for presidential candidates."  Id.

25          Despite both Governor Brown's warning and the Legislative Counsel's earlier

26   admonition, the lead authors of SB 149 announced their intent to reintroduce the bill

27   when California had a new Governor.  See McCarthy Decl, Case No. 2:19-cv-01501-

28   MCE-DB, ECF No. 10-2, ¶¶ 5-6.  And follow through they did, introducing the present

5

1   Act on December 3, 2018, less than a month after Governor Newsom was elected to

2   office.  Like its predecessor, the Act was again denominated as "the Presidential Tax

3   Transparency and Accountability Act" and contained the same material provisions as the

4   earlier SB 149, requiring partisan candidates to submit their tax returns from the five

5   previous years in order to appear on the primary ballot.[5]

6   Significantly, although no other state has enacted a requirement such as the one

7   at issue here,[6] California pushed the envelope even further by passing the Act as an

8   "urgency statute" that would go into effect immediately.[7]  The Act was deemed "urgent"

9   in this regard even though California had been conducting presidential primary elections

10  without a tax disclosure requirement since the dawn of American income taxes more

11  than one hundred years prior.

12  Given the current date for California's 2020 presidential primary, and the fact that

13  under the terms of the Act tax returns must be released 98 days beforehand, absent

14  injunctive relief, partisan candidates must disclose their taxes by November 26, 2019, in

15  order to appear on the California primary.  The instant motions seek to enjoin that

16  requirement.

17  ///

18  ///

19  ///

20  ///

21

22  [5] The Act differs somewhat from SB 149 in that the former contains more specific directions on
    how candidates must present their tax returns to the California Secretary of State.  In addition, the Act also
23  applies to state gubernatorial candidates who wish to participate in the primary election.  All parties agreed
    at the September 19, 2019, hearing, however, that the present challenges pertains only to the Act's
24  application to presidential primaries.

25  [6] On May 1, 2017, Governor Chris Christie vetoed a similar bill, S3048, passed by the New Jersey
    Legislature.  Melendez Mot., 3:24-25.

26
    [7] The California Constitution normally provides for new laws to "go into effect on January 1 next
27  following a 90-day period from the date of enactment of the statute (Cal. Const., art. IV, § 8(c)(1), but by
    denominating the statute as one of urgency "necessary for immediate preservation of the public peace,
    health, or safety" (id. at § 8(c)(3), 8(d)), the Act applied immediately and in time for California's March 3,
28  2020 primary.

6

**STANDARD**

"A preliminary injunction is an extraordinary and drastic remedy." Munaf v. Geren, 553 U.S. 674, 690 (2008). "[T]he purpose of a preliminary injunction is to preserve the status quo between the parties pending a resolution of a case on the merits." McCormack v. Hiedeman, 694 F.3d 1004, 1019 (9th Cir. 2012). A plaintiff seeking a preliminary injunction must establish that he is (1) "likely to succeed on the merits;" (2) "likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in his favor;" and (4) "an injunction is in the public interest." Winter v. Natural Res. Defense Council, 555 U.S. 7, 20 (2008); see also Short v. Trown, 893 F.3d 671, 675 (9th Cir. 2018). "If a plaintiff fails to meet its burden on any of the four requirements for injunctive relief, its request must be denied." Sierra Forest Legacy v. Rey, 691 F. Supp. 2d 1204, 1207 (E.D. Cal. 2010) (citing Winter, 555 U.S. at 22). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter, 555 U.S. at 24 (quoting Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987)). A district court should enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22 (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

Alternatively, under the so-called sliding scale approach, "[t]he Ninth Circuit weighs [the above] factors on a sliding scale", so that where there are "'serious questions going to the merits' --- that is, less than a 'likelihood of success' on the merits --- a preliminary injunction may still issue so long as 'the balance of hardships tips sharply in the plaintiff's favor' and the other two factors are satisfied." Short v. Brown, 893 F.3d 671, 675 (9th Cir. 2018).

Where the moving party alleges constitutional violations, including violations of rights secured by the First Amendment, they must make a "colorable claim" that their rights have been infringed or threatened with infringement, but upon this showing "the

burden shifts to the government to justify the restriction." <u>Thalheimer v. City of San Diego,</u> 645 F.3d 1109, 1117 (9th Cir. 2019) (citing <u>Klein v. City of San Clemente</u>, 584 F.3d 1196, 1201 (9th Cir. 2009)).

## ANALYSIS

The Court appreciates the State's desire for transparency in the political process. Requiring candidates to disclose tax returns could shed light on sources of income, potential conflicts of interest, and charitable tendencies. This information is important to a voter's ability to evaluate how a candidate's financial interests might affect future decision making. For example, in what entities or countries have candidates invested? Where have they donated? Who do they owe? These concerns are both legitimate and understandable,[8] but are undermined when candidates offer unnecessary and irrelevant excuses for shielding the public from such information.

It is not the job of the courts, however, to decide whether a tax return disclosure requirement is good policy or makes political sense. Those are questions delegated to the political branches of the federal government, that is Congress and the President, under Articles I and II of the United States Constitution. Those are the branches that make the law. Article III Courts such as this one, on the other hand, are tasked with interpreting the law and evaluating whether laws passed by the other two branches of federal government or by the states are constitutional in the first place. The job of the federal courts is therefore to follow the law and to decide questions based on the United States Constitution, which is the only thing the Court is being asked to do in these cases. Courts created under Article III of the United States Constitution are not concerned with political victories or who may or may not "win." Instead, it is the Court's job to make sure the Constitution wins. To that end, while this Court understands and empathizes with

_____

[8] In fact, these are some of the same considerations our nation takes into account when evaluating individuals who have been confirmed by the United States Senate for security clearances.

the motivations that prompted California to pass the Act, it concludes that a preliminary

injunction should nonetheless issue because the Act's provisions likely violate the

Constitution and the laws of the United States.

A.     **Likelihood of Success on the Merits**

1.     **Qualifications Clause**

The Presidential Qualifications Clause of the United States Constitution sets forth

the eligibility requirements for the Office of President:

> No person except a natural born Citizen . . . shall be eligible
> to the Office of President; neither shall any person be eligible
> to that Office who shall not have attained to the Age of thirty
> five Years, and been fourteen Years a Resident within the
> United States.

U.S. Const., art. II, § 1, cl. 5.

The United States Supreme Court analyzed the Constitution's Qualifications

Clauses in the seminal case, U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779 (1995).

There the Court held that the Framers intended the foregoing language to "fix as

exclusive the qualifications in the Constitution," "thereby divest[ing] States of any power

to add qualifications." Id. at 801, 806.  The Court reasoned that "the text and structure of

the Constitution, the relevant historical materials, and, most importantly, the "'basic

principles of our democratic system' all demonstrate that the Qualifications Clauses were

intended to preclude the States from exercising any such power . . . . " Id. at 806.

Significantly, the Court rejected any notion that a state can cloak an otherwise

impermissible qualification as a ballot access issue subject to regulation by the states

under the Elections Clause,[9] stating that states cannot indirectly create new eligibility

requirements by "dressing eligibility to stand for [public office] in ballot access clothing."

Id. at 831.

Factually, the Term Limits Court was confronted with an amendment to the state

constitution of Arkansas which would have prohibited any candidate having served more

---

[9] The Elections Clause allows states to set the "times, places and manner" of holding elections.
U.S. Const., art I, § 4, cl. 1.

than three terms in the United States House of Representatives, or two terms in the United States Senate, from appearing on the state's general election ballot for federal congressional office. The Court held this attempt to alter federal eligibility unconstitutional.[10] In delineating the line between a state's permissible power to craft procedural requirements designed to foster ballot access and its impermissible power to create new substantive qualifications for federal office, the Term Limits Court noted that a statute certainly crosses that line if it "has the likely effect of handicapping a class of candidates and has the sole purpose of creating additional qualifications indirectly." Id. at 836.

The Ninth Circuit, in Schaefer v. Townsend, 215 F.3d 1031 (9th Cir. 2000), further illuminated the applicable standard by explaining that a statute creates a new, unconstitutional qualification for federal office if it either "create[s] an absolute bar to candidates who would otherwise qualify," or "ha[s] the likely effect of handicapping an otherwise qualified class of candidates." Id. at 1035. The regulation at issue there required that candidates for federal office be registered voters, and therefore residents of the State of California, at the commencement of any candidacy for federal office. California took the position that the regulation was a mere ballot access restriction passed under its authority to regulate the time, place, and manner of federal elections. There, as here, the State argued that it had the power to adopt "generally-applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." Id. at 1037 (quoting Anderson v. Celebrezze, 460 U.S. 780, 788 (1983)).

That court disagreed. According to the Ninth Circuit, regulations passing constitutional muster under the Elections Clause regulated election procedures only and

---

[10] The Term Limits Court noted that the provision at issue there applied only to congressional office under Article I of the Constitution, but it strongly intimated that the same rationale applied with just as much force to the Qualifications Clause of Article II. Indeed, the Court made clear that states "have just as much right, and no more, to prescribe new qualifications for a representative, as they have for a president." Id. at 803. Moreover, the Court observed that the Qualifications Clauses "reflect the idea that the Constitution treats both the President and Members of Congress as federal officers" over which the states only have delegated, as opposed to reserved, powers. Id. at 805 n. 17. The fact that the Term Limits Court referred to "Qualifications Clauses" in the plural further suggests that its reasoning applies equally to presidential qualifications.

"did not even arguably impose any substantive qualification rendering a class of potential candidates ineligible for a ballot position." Id. at 1038 (citing Term Limits, 514 U.S. at 835). While control over the procedural aspect of an election or requiring a candidate to show a minimum level of support before running (and potentially crowding the ballot)[11] may be permissible, Schaefer found that the residency requirement before it was not. Instead, it plainly handicapped those candidates who did not comply and had the effect of deterring them from running. Id.

Similarly, although the Act challenged in this case does not present an absolute bar to candidates running for office, it is equally clear that, like in Schaefer, it has the likely effect of "handicapping" non-disclosing candidates. The Act has nothing to do with the extent of support a candidate may enjoy and plays no role in ensuring that procedural integrity of the election. To the contrary, it prevents a number of candidates from appearing on the primary ballot absent disclosure of their tax returns, and in so doing impairs their ability to win California's Republican presidential primary election, to obtain the support of California's delegates to the Republican National Convention, and to secure the party's nomination for President. This complete denial of ballot access constitutes a severe handicap because "there is no denying that the ballot restrictions will make it significantly more difficult for the barred candidate to win the election." 514 U.S. at 831.[12] It follows that barring candidates in this manner is the type of burden that "demands serious constitutional scrutiny." Short v. Brown, 893 F.3d at 677.

The State's Claim that the Act is a procedural "times, places and manner" requirement permissible under the Elections Clause is simply not viable. Unsurprisingly,

_____

[11] See, e.g., Lubin v. Panish, 415 U.S. 709, 715, 718-19 (1974) (a state may restrict ballot access to eliminate as many "frivolous candidac[ies]" as possible by requiring candidates to "demonstrat[e] the existence of some reasonable quantum of voter support" through, for example, petitions signed by voters); Ill State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 185 (1979) ("[W]e have upheld properly drawn statutes that require a preliminary showing of a significant modicum of support before a candidate or party may appear on the ballot.").

[12] While the State argues that the disclosure requirement does not apply to the general election, that distinction does not save the Act since the Supreme Court has long held that constitutional requirements apply just as squarely to primaries as they do to the general election. See Tashjian v. Republican Party, 479 U.S. 208, 227 (1986).

the Term Limits Court held that the Elections Clause implicitly prohibits states from enacting provisions designed to benefit or to hinder certain candidates. Term Limits, 514 U.S. at 833-34 ("[T]he Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints") (emphasis added). The procedural grant of power to the states extended by the Elections Clause instead "encompasses matters like 'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.'" Cook v. Gralike, 531 U.S. 510, 523-24 (2001) (citing Smiley v. Holm, 285 U.S. 355, 366 (1932)).

To the extent the Act mandates disclosure of tax returns to qualify for the presidential primary, it does none of those things and, despite Defendants' best efforts, it simply cannot be characterized as procedural. Its provisions do not pertain to the administration of an election (e.g., reducing ballot clutter by excluding candidates without sufficient electoral support). Nor can it be considered an even-handed restriction to "protect the integrity and reliability of the electoral process itself" or to ensure "orderly, fair, and honest elections" by providing financial information to voters. Term Limits, 514 U.S. at 834. If this was truly the State's even-handed objective, it presumably would have passed some version of the Act in 1992, when former California Governor Jerry Brown elected not to release his tax returns while running for the Democratic nomination for President. At base, the Act seeks to punish a class of candidates who elect not to comply with disclosing their tax returns by handicapping their access to the electoral process.[13] This is plainly impermissible.

---

[13] The State's argument that a "class of constitutional concern" must be identified in order to entitle a group of candidates to qualify for such protection, and that no qualifying class in that respect has been identified here, is unpersuasive. Defs.' Opp, 8:25-27. Despite the State's contention, no authority for any such limitation has been identified. Instead, by barring all qualifications other than those set out in the Constitution, the Framers exhibited concern for all "candidates who would otherwise meet the requirements of the Qualifications Clause." Schaefer, 215 F.3d at 1035. To read the phrase "class of constitutional concern" otherwise would nullify the Qualifications Clause.

The Supreme Court's decision in <u>Cook v. Gralicke</u>, 531 U.S. 510 (2001), is also helpful in underscoring the conclusion that this Act is constitutionally impermissible. In that case, Missouri passed an initiative that required ballots to disclose whether federal candidates for the House and Senate supported Congressional term limits. <u>Id.</u> at 514. Missouri defended its legislation on grounds that it "merely regulated the manner in which elections are held by disclosing information about congressional candidates" and consequently was a valid exercise of Missouri's delegated power under the Elections Clause. <u>Id.</u> at 523. The Supreme Court disagreed, finding that the law bore "no relation to the 'manner' of elections as we understand it." <u>Id.</u> Instead, the law was "plainly designed to favor candidates" supporting term limits in an attempt to handicap those candidates who did not. <u>Id.</u> at 524. According to the Court, the Constitution's grant of power to the states "to prescribe the procedural mechanisms for federal elections" does not include the ability "to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional constraints." <u>Id.</u> at 523.

Moreover, the Court pointed out, "by directing the citizen's attention to the single consideration of the candidate's fidelity to term limits," the Missouri law implied that the issue was "an important—perhaps paramount—consideration in the citizen's choice." <u>Id.</u> at 525. It, therefore, could potentially, "decisively influence the citizen to cast his ballot against candidates branded as unfaithful" to the idea of term limits. <u>Id.</u> Similarly in this case, the Act draws undue attention to that class of candidates electing not to disclose their tax returns, and by so doing operates to brand them as inferior. As such, the Act imposes an additional substantive qualification beyond the exclusive confines of the Qualifications Clause and is likely invalid on that basis as well.

Furthermore, from a practical perspective, allowing individual states to potentially adopt disparate and inconsistent qualifications for presidential primary candidates tramples the Framers' vision of having uniform standards for the qualifications of those individuals running for President. Former California Governor Jerry Brown's admonition in vetoing the Act's earlier iteration is particularly instructive on this point. If allowed to

13

stand, the Act would potentially open the floodgates permitting each state to foreclose ballot access to presidential candidates on various alleged informational grounds. The Court can easily foresee this extending far beyond tax information to the disclosure of confidential medical records, psychiatric and therapist records, academic records, family law records, or other privileged information.[14] The list of allegedly "relevant" information required to obtain ballot access could therefore snowball out of control with no practical limitation as legislatures throughout the nation could impose their own qualifications on presidential candidates, perhaps for nakedly political purposes. That result cannot possibly comport with the Framers' goal for a fixed and nationwide standard for such federal offices.

Finally, in this day and age of partisan politics, evaluating the constitutionality of the Act is one of the most non-partisan questions of which the Court can conceive. At oral argument, there were repeated references to this being a "Republican" issue, but the protections afforded by the Qualifications Clause extend to all candidates irrespective of their political affiliation. While this case concerns a law passed by a Democratic majority in the California Legislature, and while it fundamentally targets a Republican presidential candidate, in a different political climate or a different state the roles and putative requirements could easily be reversed. The dangerous precedent set by this Act, allowing the controlling party in any state's legislature to add substantive requirements as a precondition to qualifying for the state's presidential primary ballot, should concern all candidates alike, Republican, Democrat, or otherwise. It certainly concerns the Court. But ultimately, neither the Constitution nor the Court are concerned with which party a candidate or voter most closely aligns. As such, for all of the reasons

///

---

[14] It is not difficult to imagine that a state could find, for example, just as compelling a reason to force release of a candidate's mental and physical health records for "informational" purposes, particularly where a candidate might be older or have some preexisting health concerns. The troubling minefield this presents is all too apparent in terms of permitting each state to make its own informational demands. While there is little analytical difference in terms of the Act's stated "informational" purpose from the alleged "information" that such records might provide, the invasion of privacy concerns would make any such mandate almost assuredly unconstitutional.

set forth above, the Court finds that Plaintiffs are likely to prevail on their contention that the Act violates that Clause.

### 2. First Amendment Rights of Association and Ballot Access

The Constitution guarantees, among other things, "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Ill. State Bd. of Elections, 440 U.S. at 184 (quoting Williams v. Rhodes, 393 U.S. 23, 30 (1968)). Ballot access restrictions "implicate the right to vote" because "limiting the choices available to voters . . . impairs the voter's ability to express their political preferences." Id. The rights of individual voters to associate with, and vote for, the candidate of their choice "rank among our most precious freedoms." Williams, 393 U.S. at 30-31 (citing Wesberry v. Sanders, 376 U.S. 1, 17 (1964)). Moreover, as the Supreme Court also noted, the "freedom to associate as a political party" also "has diminished practical value if the party can be kept off the ballot." Ill. State Bd. Of Elections, 440 U.S. at 184.

According to Plaintiffs, by barring partisan presidential candidates who decline to release their tax returns from appearing on the California primary ballot, the Act imposes a severe burden on voters' ability to access the ballot and vote for the candidate of their choice. Additionally, President Trump further claims that the Act similarly burdens his ability to appear on the Republican primary ballot and to associate with Republican voters in California. The Trump Campaign as well as the Republican National Committee and the California Republican Party make similar arguments.

To evaluate these arguments, the Court applies the so-called Anderson/Burdick test established by the Supreme Court in Anderson v. Celebrezze, 460 U.S. 780 (1983) and Burdick v. Takushi, 504 U.S. 428 (1982). To the extent that voting rights "are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance,'" with a strict level of scrutiny therefore imposed. Burdick, 504 U.S. at 434 (quoting Norman v. Reed, 502 U.S. 279, 289 (1992)). Should the restriction at issue trigger less than strict scrutiny, a balancing test is instead

15

1   employed.  Courts must weigh 1) the character and magnitude of the asserted injury to

2   the rights protected by the First and Fourteenth Amendments; 2) the precise interests

3   and justifications put forward by the state for the imposed ballot restriction; and 3) the

4   extent to which the state's interests make it necessary to burden the plaintiff's rights.

5   See Anderson, 460 U.S. at 789.  Even restrictions that impose a lesser burden in this

6   regard must be reasonably related to furthering the state's important regulatory interests.

7   Chamness v. Bowen, 722 F.3d 1110, 1116, (9th Cir. 2013).  To the extent the

8   presidential race is national in scope, a state's interests in regulating presidential

9   elections is weaker than for purely statewide elections.  Anderson, 460 U.S. at 795.[15]

10          Here, the Act creates what amounts to a functional bar against the ability to cast

11  an effective vote for a candidate who elects not to disclose his or her tax returns.  It

12  further interferes with the ability of both individuals and political parties to select the

13  individual presidential candidate of their choice to act as the "standard bearer who best

14  represents [their] ideologies and preferences."  Eu v. San Francisco Democratic Comm.,

15  489 U.S. 214, 224 (1989).[16]  In this case that includes the incumbent President of the

16  United States.  These are severe restrictions, since limitations on ballot access can

17  violate multiple constitutionally-protected interests, including the right to associate for

18  ///

19  ///

20  ///

_____

[15] While the State disagrees, insisting that 'the Act regulates only California's presidential primary election, the result of which is determined by in-state voters" (Defs.' Opp, 11:21-23), that argument misses the mark.  As a practical matter, presidential primaries impact the primaries in other states and therefore impact the general election as well.  Indeed, California's recent change in moving its primary from June to March appears in part to have been intended to garner more say in the national nominating process.  See SB 568 Primary Elections:  Election Date, California Legislative Information, "Bill Analysis" Tab, Assembly Floor Analysis 2 (Sept. 13, 2017).

[16] It is also no small matter that where, as here, the limitation on ballot access involves a candidate at the top of the primary ticket in California.  A restriction on the ability to vote for that candidate could likely depress the party's voter turnout in general, and therefore adversely affect down-ballot congressional and state-level candidates as well.  This is particularly true in California since voters approved a "Top Two Primary" system, where the two candidates receiving the most votes in the primary proceed to the general election regardless of their party affiliation.  See Bryant Decl., Case No.19-cv-1506-MCE-DB, ECF No. 17-3, ¶¶ 11-13.

16

political purposes, the right to vote, and the right to express political preferences.[17]

Ill. State Bd. Of Elections, 440 U.S. at 184; Chamness, 722 F.3d at 1116 (a measure which "significantly impairs" ballot access "imposes a severe First Amendment restriction").[18]  As such, they are subject to strict scrutiny.

The fact that a candidate can still conceivably qualify for the primary as a write-in or independent candidate does not change that calculus.  See Anderson, 460 U.S. at 799 n.26 ("We have previously noted that [a write-in] opportunity is not an adequate substitute for having the candidate's name appear on the printed ballot."); Term Limits, 514 U.S. at 831 ("[E]ven if petitioners are correct that incumbents may occasionally win reelection as write-in candidates, there is no denying that the ballot restrictions will make it significantly more difficult for the barred candidate to win the election.").

Nor can Defendants show that the Act is either narrowly drawn or serves a compelling state interest.  To the extent that the State argues that a candidate's asserted "choice" in deciding whether to disclose tax returns makes the restriction narrow in scope, the Supreme Court's decision in Cook is instructive.  There, as indicated above, the Supreme Court struck down a Missouri constitutional amendment which directed the Secretary of State to identify on the ballot those candidates who did not support federal term limits.  That was also a "voluntary" act that the Court struck down as unconstitutional.  Yet this case goes even further in keeping a candidate's name off the

---

[17] The State nonetheless contends that any burden is only "slight" because all candidates are able to disclose their financial interests if they choose to do so.  But that is not the point.  The logistical burdens of disclosure in this case are minimal compared to the burden of constitutional concern, which is forcing candidates to make the choice between running for President and disclosing their tax returns.  See Schaefer, 215 F.3d at 1037 (forcing out-of-state candidates to choose between relocating or being barred from the ballot constituted an impermissible qualification).  States cannot avoid the First Amendment's protections by disingenuously characterizing a condition as "voluntary," when it is fact coerced.  See Term Limits, 514 U.S. at 829 ("As we have often noted, constitutional rights would be of little value if they could be indirectly denied").  Moreover, the fact that candidates may be able to disclose their tax returns if they so choose does not change the fact that voters also have a First Amendment right to associate with and nominate candidates who refuse to do so.

[18] Requiring presidential candidates to disclose tax returns in order to exercise First Amendment rights to access voters is a severe burden both because of the fundamental nature of those rights and since, as the Ninth Circuit has recognized, "[a] tax return and related information contains many intimate details about the taxpayer's personal and financial life" to which a taxpayer has a right of privacy.  United States v, Richey, 924 F.2d 857, 861 (9th Cir. 1991).

1  ballot entirely, and <u>Cook's</u> finding of unconstitutionality therefore applies with even more

2  force here.

3      Moreover, the <u>Cook</u> Court also rejected the argument that Missouri's purported

4  objective in educating or notifying voters as to a candidate's stance on terms limits was

5  compelling.  While a state may educate voters as to the "procedural mechanisms" for

6  federal elections, they cannot "dictate electoral outcomes, to favor or disfavor a class of

7  candidates" or "evade important constitutional restraints" under the guise of voter

8  education.  <u>Cook</u>, 531 U.S. at 531.  In this case, the State's interest in doing so in the

9  first place is further weakened by the fact that the Act purports to restrict access to the

10  federal presidential primary, where it "has a less important interest" in regulation than in

11  statewide or local elections since the outcome of the race "will be largely determined by

12  voters beyond the State's boundaries."  <u>Anderson</u>, 460 U.S. at 795.[19]  At the end of the

13  day a voter can simply decline to vote for a candidate who chooses not to release his or

14  her tax returns.  Simply allowing voters to make that choice without further interference is

15  clearly the narrowest, and least intrusive, approach of all.

16      The State's professed interest in voter education is somewhat specious in any

17  event because it does not extend to all candidates in every scenario.  Instead, the Act

18  applies only to party-affiliated candidates (exempting independent and write-in

19  candidates) and affects only the primary, and not the general, election.  If California

20  legitimately wanted to "provide voters with essential information regarding the

21  candidate's potential conflicts of interest" to help them make a more informed decision,

22  as the interest statement contained in Government Code § 6881 indicates, it would keep

23  the tax returns public through the general election and not remove them from the

24  Secretary of State's website once the primary election concludes.  It is also difficult to

25  see how the Act's mandate in directing production of tax returns is "narrowly drawn" to

26  protect the state's purported interest in ensuring that voters are informed as to potential

27      [19] The fact that states have more leeway in regulating congressional elections under the Elections
Clause than they do in presidential elections is therefore not surprising.  <u>See, e.g.</u>, <u>Arizona v. Inter Tribal
28  Council of Arizona, Inc.</u>, 570 U.S. 1, 8 (2013); <u>Rucho v. Common Cause</u>, 139 S. Ct. 2484, 2495 (2019).

18

conflicts of interest when the provisions of EIGA already require candidates to submit detailed financial information concerning the extent of income, gifts and property holdings as well as the identification of any positions held in a business enterprise.  See 5 U.S.C.A. Appx. 4, § 102.  The State has not identified anything missing on an EIGA disclosure that could be found on a tax return to serve the Act's purported interests.  Accordingly, the Court concludes that Plaintiffs are likely to prevail on their claim that the Act violates their First Amendment rights to freedom of association and ballot access.

### 3.    Equal Protection under the Fourteenth Amendment

The Fourteenth Amendment's Equal Protection Clause guarantees that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., amend. XIV, § 1.  Two of the related cases, filed on behalf of the Griffin and Melendez Plaintiffs (Case Nos. 2:19-cv-1477-MCE-DB and 2:19-cv-1506-MCE-DB, respectively), argue that the Act is unconstitutional to the extent it requires a political party's candidates for President to disclose his or her tax returns in the primary election but exempts independent candidates from doing so.  By distinguishing among constitutionally eligible candidates for President in that manner, Plaintiffs argue that the Act imposes greater burdens on the voting and associational rights of California voters who support major party candidates than those who support independents.  According to Plaintiffs, this triggers equal protection concerns.  See Lubin v. Panish, 415 U.S. at 716 ("The right of a party or an individual to a place on the ballot is entitled to protection and is intertwined with the rights of voters"); see also Matsumoto v. Pua, 775 F.2d 1393, 1396 (9th Cir. 1985).

In Anderson, the Supreme Court cautioned courts to carefully scrutinize laws which impose "burden[s] that fall unequally on major-party and independent candidates." 460 U.S. at 793-94; see also Soltysik v. Padilla, 910 F.3d 438, 446 (9th Cir. 2018) (recognizing that plaintiff had stated valid equal protection claim where state law imposed an "unequal burden" on independent as opposed to party-affiliated candidates). While distinctions in how the two groups are treated may be permissible, that is only the

case where those distinctions are constitutionally relevant.  <u>Jenness v. Fortson</u>, 403 U.S. 431, 441 (1971) (recognizing that the needs and potential of a political party with historically broad support differ from a new or broad political organization, and that consequently the latter may be exempt from having to establish all the criteria of a well-established party in order to participate in primaries).

The Ninth Circuit has recognized, however, that independent candidates seeking to run in the general election are "essentially similar" to partisan candidates seeking to run in a party primary.  <u>Van Susteren v. Jones</u>, 331 F.3d 1024, 1027 (9th Cir. 2003). Accordingly, there is no basis for subjecting the two groups to different burdens.  The State lacks any valid interest in providing voters with more information about party-backed candidates than independent candidates, especially when such requirements can lead to the exclusion of only major party candidates from the ballot.  Consequently, Plaintiffs are likely to succeed in demonstrating that the differing burdens are unconstitutional under the Equal Protection Clause as well.

### 4.     Preemption by the Ethics in Government Act ("EIGA")

Finally as to the merits, and as already mentioned above, Title I of EIGA provides for the disclosure of "source, type, and amount or value of income"; honoraria from any source; dividends, rents, interest, and capital gains, and interests in property; the "entity and category of value of the total liabilities owed to any creditor"; and the identity of all positions held "as an officer, director, trustee, partner, proprietor, representative, employee, or consultant of any corporation, company, firm, partnership, or other business enterprise, any nonprofit organization, any labor organization, or any educational or other institution."  <u>See generally</u> 5 U.S.C.A. App. 4, § 102.  Title I of the EIGA also protects candidates from the need to make different or additional disclosure by expressly displacing all other similar federal or state disclosure laws.  It expressly "supersede[s] any general requirement under any other provision of law or regulation with respect to the reporting of information required for purposes of preventing conflicts of interest or apparent conflicts of interest."  <u>Id</u>. at § 107(b).

Like EIGA, by requiring production of a candidate's tax returns for the preceding five years, the Act also purports to provide for the disclosure of extensive financial information by candidates running for President, with one of its chief purposes being "to provide voters with essential information regarding the candidates' potential conflicts of interest, business dealings, financial status, and charitable donations."  Cal. Elec. Code § 6881.  As such, according to the Trump Plaintiffs, the Act is plainly a "law or regulation with respect to the reporting of information required for purposes of preventing conflicts of interest" as described by EIGA, and by EIGA's express provisions it is preempted.

The State nonetheless claims that because § 107(b) makes no explicit reference to preemption of state law, and because a previous version of the statute did explicitly do so in another context, no preemptive intent should be inferred.  <u>See</u> Defs.' Opp., 27:21-28:11.  In this regard, the State cites a presumption against preemption, in fields traditionally occupied by the states, unless the clear and manifest purpose of Congress suggests otherwise.

Defendants' statement of the law may be correct, but it has no bearing here because regulation of federal officeholders is clearly not a field traditionally occupied by the states.  Moreover, although the words "state" and "preemption" appear nowhere in the text of § 107(b), the statute is nonetheless unambiguous.  Congress clearly intended that the EIGA "supersede" state laws touching on the field of financial disclosures and conflict-of-interest laws for federal officeholders.  "Supersede" means to "[o]bliterate, set aside, annul, replace, make void, inefficacious or useless, repeal."  <u>See</u> Black's Law Dictionary (6th ed. 1990).  Section 107(b) of EIGA therefore "set[s] aside" and "replace[s]" "any general requirement under any other provision of law or regulation with respect to the reporting of information required for purposes of preventing conflicts of interest or apparent conflicts of interest."  By using the expansive term "any" with the phrase "other provision of law or regulation," the plain and ordinary language of EIGA

///

///

unambiguously gives it preemptive force over the Act.[20]  Plaintiffs are accordingly likely to prevail on the merits with respect to EIGA preemption as well.

### B.    Irreparable Harm

Moving on to the remaining inquiries in evaluating whether preliminary injunctive relief is warranted, the Court turns first to irreparable harm.  The Ninth Circuit has long recognized that constitutional violations in general constitute irreparable harm.  See, e.g., Stormans, Inc. v. Stelecky, 586 F.3d 1109, 1138 (9th Cir. 2009) ("constitutional violations cannot be adequately remedied through damages" and therefore generally constitute irreparable harm); Goldie's Bookstore, Inc. v. Super. Ct., 739 F.2d 466, 472 (9th Cir. 1984) (an alleged constitutional infringement by deprivation of equal protection "will often alone constitute irreparable harm.").  This is particularly true in cases, like this one, challenging candidate qualifications restricting ballot access.  See Matsumoto, 775 F.2d at 1395-96.  The rationale for such a finding is simple:  "If the plaintiffs lack an adequate opportunity to gain placement on the ballot for this year's election, this infringement on their rights cannot be alleviated after the election."  Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 883 (3d Cir. 1997).

The Ninth Circuit has further emphasized that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Klein v. City of San Clemente, 584 F.3d 1196, 1208 (9th Cir. 2009).

Given the findings above that Plaintiffs are likely to prevail in establishing constitutional violations premised on both the Qualifications Clause, First Amendment rights of association and ballot access, and Fourteenth Amendment rights grounded in equal protection, this Court finds that the requisite irreparable harm is present and that this factor weighs in favor of granting a preliminary injunction.

///

///

---

[20] Given the statute's plain and ordinary meaning, any resort to legislative history is unnecessary. See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992).

C.     **Balance of Equities**

The balance of equities also weighs in Plaintiffs' favor.  The public interest served by ensuring that individual voters may associate for the advancement of political beliefs and cast a vote for their preferred candidate for President is extraordinary.  Williams, 393 U.S. at 30-31.  The State, on the other hand, "can derive no legally cognizable benefit from being permitted to further enforce an unconstitutional limit on political speech."  Sanders Cnty. Republican Cent. Comm. v. Bullock, 698 F.3d 741, 749 (9th Cir. 2012).  As the Ninth Circuit has explained, it is "clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available."  Valle del Sol, Inc. v. Whiting, 732 F.3d 1006, 1029 (9th Cir. 2013).  Simply raising a "serious First Amendment question[] compels a finding . . . that the balance of hardships tips sharply in Plaintiffs' favor."  Am. Beverage Ass'n v. City & Cty. Of San Francisco, 916 F.3d 749, 758 (9th Cir. 2019).  Therefore, a consideration of the balance of equities also points to the propriety of a preliminary injunction in this matter.

D.     **Public Interest**

Finally, as the Ninth Circuit noted in American Beverage, "it is always in the public interest to prevent the violation of a party's constitutional rights."  Id. at 758.  This factor accordingly also weighs in favor of an injunction here.

## CONCLUSION

As set forth above, the Court finds that Plaintiffs are likely to prevail on the merits of their arguments that the Act 1) violates the Presidential Qualifications Clause contained in Article II of the United States Constitution; 2) deprives Plaintiffs of their rights to associate and/or to access the ballot, as guaranteed by the First Amendment of the Constitution; 3)  further violates the Constitution's Equal Protection Clause as set

///

forth in the Fourteenth Amendment; and 5) is preempted by the provisions of EIGA in any event.

The Court further finds that Plaintiffs have demonstrated irreparable harm, have shown that the balance of equities weighs in their favor, and have established to the Court's satisfaction that the public interest tips in favor of enjoining implementation of the Act insofar as it pertains to candidates for President of the United States. Plaintiffs' various Motions for Preliminary Injunction in the related cases are therefore GRANTED. Defendants are hereby ENJOINED from enforcing the provisions of the Presidential Tax Transparency and Accountability Act to the extent they require candidates for the presidency to disclose their tax returns as a condition of appearing on California's presidential primary ballot. See Cal. Elec. Code §§ 6883-6884. No bond will be required.

IT IS SO ORDERED.

Dated: October 2, 2019

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE